UNITED STATES of America,
Plaintiff,

v.

E. I. DU PONT DE NEMOURS AND
COMPANY, et al., Defendants.

Civ. A. 49 C 1071.

United States District Court,
N. D. Illinois, E. D.

Nov. 16, 1954.

See, also, 126 F.Supp. 235.

Earl A. Jinkinson, Department of Justice, Chicago, Ill., for the United States.

Sidley, Austin, Burgess & Smith, Chicago, Ill., Covington & Burling, Washington, D. C., Root, Ballantine, Harlan, Bushby & Palmer, New York City, Ferris E. Hurd, Pope & Ballard, Chicago, Ill., Henry M. Hogan and Robert A. Nitschke, Detroit, Mich., Arthur, Dry & Dole, New York City, Snyder, Chadwell & Fagerburg, Chicago, Ill., Mark H. Clayton, Chicago, Ill., William S. Potter, Berl, Potter & Anderson, Wilmington, Del., Alexander L. Nichols, Morris, Steele, Nichols & Arhst, Wilmington, Del., Guy A. Gladson & Thomas A. Reynolds, Chicago, Ill., Richards, Layton & Finger, Wilmington, Del., Andrew J. Dallstream, Chicago, Ill., Howard Ellis and A. Leslie Hodson, Chicago, Ill., Claude A. Roth, Chicago, Ill., for defendants.

LA BUY, District Judge.

There are forty-five exhibits which have been submitted at the close of the trial and offered in evidence subject to further ruling. Thirty-nine are government exhibits offered as rebuttal evidence and six are defense exhibits offered in surrebuttal.

The major portion of the thirty-nine exhibits offered by the government are directed to trade data. Eleven are statistical charts showing the ultimate percentage of business transacted between General Motors and du Pont and its competitors. To meet the evidence in these exhibits, the defendants have offered six surrebuttal exhibits which are also statistical charts. Twelve government exhibits consist of excerpts from Annual Competitive Reports made by the du Pont Fabrics and Finishes Department to the du Pont Executive Committee regarding trade in these products and the factors affecting increases or decreases in sales each year. The balance of the government's exhibits consist of various letters or reports written in different years relating to a variety of subjects.

Defendants' principal objections to the government's exhibits are fourfold and are asserted either separately or in combination. These objections are (1) the offered exhibits are not proper rebuttal evidence and were properly a part of the main case; (2) some of them seek to impeach testimony of certain witnesses without having laid a proper foundation for such purpose; and further to allow these exhibits introduced at the close of the trial would be prejudicial to the defendants because the witnesses have been foreclosed the opportunity of being confronted with the alleged impeaching documents; (3) some of the exhibits are inadmissible as being hearsay evidence, and (4) the statistical exhibits are inaccurate and misleading.

The principal objection to the bulk of these exhibits is that they were properly a part of the government's case in chief and pursuant to rules governing orderly presentation of evidence should have been so submitted and not reserved until rebuttal. This is one of the criteria followed by this court in its ruling with respect to the government's motion for discovery made near the close of the trial. In its memorandum this court recognized that the customary order of presenting evidence was not immutable and was subject to the permeating objective of litigation to give opportunity for full disclosure of all facts in order to render a just determination. To this end, discretion reposes in the court to admit or reject evidence proffered out of context mindful that no prejudice should be suffered by the one against whom the evidence is offered. Furthermore, in anti-trust cases, if full effect is to be given the anti-trust laws, it is necessary to develop fully the background of facts out of which the alleged conspiracy arose and in which it operated, and that broad discretion and great latitude toward the reception of evidence should be exercised.

In ruling on these exhibits the court considers them in their numerical order.

## GTX 199

In 1941 W. S. Carpenter, President of du Pont, wrote to Donaldson Brown at General Motors regarding certain proposed changes in the organization of General Motors which were being considered by the Policy Committee expressing concern regarding the shortcomings of moving able personnel, specifically a Mr. Bradley, from the financial department to the operations department without providing for equal caliber to fill the vacancy. Mr. Brown replied to Carpenter, which letter has been objected to by the defendants.

In this letter Brown seeks to explain a presumed misconception of Carpenter and Lammot du Pont as "to the strength of personnel in the Finance Department of General Motors" saying:

"In the first place I think you and Lammot have gained somewhat of a false impression for a too-literal reading of the organization chart as it has pictured the financial department. My name has appeared in blocks representing Financial Department and also representing the group of activities embracing GM AC, GEIC, and MIC giving to you the impression that I was to be regarded as in administrative charge of these branches. Such has not been the case, and the new chart that is being prepared will be corrected and thereby remove any possible misinterpretation in this respect. * *

"Now, as to the central organization of General motors, as it may be concerned with the financial aspects there is no weakness existing as I can see it. The application of Mr. Bradley's knowledge and feel of the financial aspects is not lost. In fact it is enhanced by the new duties he has assumed. The financial department remains separate, organizational-wise from operations and is responsible to the Policy side of management. Effort will continue in training of men in the attainment of experience and skill in dealing with financial aspects and bringing in operating executives to greater consciousness of financial considerations and of the essential principle of coordinated control. * * * "

The basis of the defendant's objection to this exhibit is that it is not proper rebuttal evidence and that at one time plaintiff proposed to offer it as a part of its case in chief. The government maintains it is proper rebuttal of "new subordinate evidential facts" offered by the defense—that defendants introduced organizational charts GM 2–6, inclusive, designed to show that although du Pont representation may dominate the financial affairs of General Motors, there was a sharp separation of finances from operations.

The court is of the opinion this exhibit is proper rebuttal evidence. The objection of the defendants is overruled and the exhibit is received in evidence.

## GTX 230

This is a letter written by Sloan on November 28, 1947 to Donaldson Brown concerning General Motors directors. Sloan at the time of this writing was Chairman of the Board and Brown was a member of the General Motors Board, a director of the du Pont Company, a member of the Financial Policy Committee of General Motors, and also a member of the Finance Committee of the du Pont Company. A copy of this letter was sent to W. S. Carpenter, who was also a member of the General Motors Financial Policy Committee, a director of General Motors and du Pont, a member of the Finance and Executive Committees of the du Pont Company and its then President.

The significant part of the letter from the government's point of view is the last paragraph:

"I might add to this, that I think the proper group—to the extent that there is a group—to discuss candidates ought to be the members of the Financial Policy Committee. I do not think it is an operating matter, in any sense of the word. By all this I mean, that the recommenda-

tions of the Financial Policy Committee, not as a Committee, but as individuals, should determine the recommendations to the Board because I am sure we would feel that the Board should have a voice in determining who is to be added to its membership, aside from the fact that its favorable action is necessary."

The government states it is offered as rebuttal to the testimony of Sloan concerning the manner of the nomination of men to membership of the General Motors Board of Directors; that Sloan's testimony that he discussed such directors with the General Motors Board raised the subordinate factual issue that the advice and guidance of the du Pont representatives on the matter of directors was not sought out and followed any more than any other directors. (Sloan 2486-7, 2496). It is asserted that financial responsibility for General Motors being regarded as within the acknowledged sphere of the du Pont perimeter, this exhibit shows that Mr. Sloan regarded the Financial Policy Committee as the important body to determine candidacy of Board members of General Motors—ergo, the du Pont members on that committee determined the recommendations to the Board.

Objection has been made by the defendants to the receipt of this letter into evidence for the reasons (1) it is not proper rebuttal evidence and should have been introduced as part of the case in chief since the issue of du Pont influence on directors of General Motors was in the case from the beginning (Amd.Comp. par. 51, Ans. par. 51), and (2) it is not proper for impeaching Sloan's testimony since no proper foundation has been laid and furthermore it was not introduced until the end of the trial when Sloan was no longer available as a witness to be questioned regarding the letter.

■ The Court is of the opinion that this exhibit was properly a part of the Government's main case and should have been offered earlier. To admit it in evidence at the end of the trial, when the writer was no longer available to testify concerning its contents, would be prejudicial to the rights of the defendants. Therefore the objections of the defendants are sustained.

### GTX 237, GTX 238

These two exhibits are not covered in the government's brief relating to admissibility. Both of these letters were written during July 1923 when the General Motors bonus plan was still in the proposed stage.

■ In GTX 237 Donaldson Brown, Vice-President of General Motors, wrote to W. S. Carpenter, President of the du Pont Company, who had expressed objection to the contemplated plan on the ground of its "rigidity", stating that he saw this feature as "advantageous provided the plan is administered in the way we have in mind". Brown's objection to Carpenter's suggestions from a tax point of view were that the sale of du Pont's General Motors stock to recipients of bonus awards whose ability to pay therefor would be largely contingent upon further enjoyment of bonuses would put the du Pont Company in an "awkward position in view of the fact, that by reason of its representation on the Finance Committee of General Motors Corporation, it would be in a position to largely control the award of bonuses." GTX 238 is Carpenter's reply to Brown and discusses the proposed plan further in line with his objections.

Defendants' objections are that these documents are irrelevant and in any event should have been introduced as a part of the case in chief. While these exhibits could properly have been introduced as part of the main case, the court is of the opinion no prejudice results in their introduction as rebuttal material. The objections of the defendants are overruled and the exhibits are received in evidence.

### GTX 458

■ Sloan testified that he invited Pierre du Pont to attend the first meeting of the General Purchasing Committee "simply to give it a little atmosphere"

**32**

and that neither Pierre du Pont nor Raskob had anything to do with the committee whatsoever and were not concerned with operations. (2548) To rebut this evidence, the Government has offered a memorandum of August 6, 1923 from Sloan directed to Pierre du Pont, John Raskob, C. S. Mott, and Fred J. Fisher reporting on a decision reached at a meeting of the committee wherein he stated that as the result of action by the Operations Committee he had issued instructions that divisions purchasing agents would not be permitted to buy outside of General Motors purchasing committee contracts; that because this was the first time, as a matter of policy, that he had taken away any divisional prerogative, he wanted the Executive Committee to know and understand the reasons.

Defendants have objected to this exhibit on the ground that it is offered to impeach Sloan's testimony, and that it is not rebuttal evidence. These objections are overruled and the exhibit is received in evidence.

### GTX 483–6

■ These four exhibits represent an exchange of correspondence between John Pratt, Vice-President of General Motors and Gordon Lefebvre, General Manager of General Motors of Canada, and a similar exchange between Pratt and William Coyne of du Pont. Pratt discusses with Lefebvre the switch by General Motors from du Pont to U. S. Industrial Alcohol Company for its thinner requirements in 1927 stating that it had been found necessary as a disciplinary measure to place some of their thinner business with U. S. Industrial Alcohol to bring down the price of Duco and thinner. Pratt wrote to Coyne concerning the problem that du Pont never voluntarily reduced its prices to General Motors on products and had done so only after outside competition had been brought in.

The government states that defendants introduced DP 224 to show that when General Motors failed to renew its six-month contract with U. S. Industrial Alcohol for thinner and purchased it from du Pont, it was because their price was lower than that of its competitor. To rebut the implication of this evidence that du Pont lost the business for six months and therefore did not occupy a preferential supplier status with General Motors, the government has introduced the aforesaid exhibits. The only objection to these exhibits is that the government had already presented some of its evidence on industrial alcohol during its case in chief—GTX 467–9—and should have introduced these as well.

The objection of the defendants is overruled and these exhibits are received in evidence.

### GTX 1347

■ Sloan testified that du Pont "had nothing to do except to authorize the General Managers Securities Company to sell to the Managers Securities Company a thirty per cent interest in General Managers Securities Company". (2892) He further stated that "on the face of that, it was an impossibility" for the plan to have the effect of inducing General Motors Executives to respond readily to the influences of the du Pont Company. (2906). To show it was not an impossibility and to rebut this assertion, the government has introduced GTX 1347 to demonstrate "how the General Motors incentive plans have operated to do just what was intended—to place General Motors executives under pressure from the large stockholder, the du Pont Company."

The exhibit is a memorandum, dated December 5, 1944, from W. S. Carpenter, then a member of the General Motors Policy Committee, a director in General Motors and President of du Pont, to Lammot du Pont, also a member of the Policy Committee, director of General Motors, and Chairman of the Board of the du Pont Company, dealing with two topics: (1) the bonus plan, and (2) advisability of asking a Mr. McLucas to join the General Motors Board. The memorandum refers to George Whitney's

conversation with Carpenter about Charles Wilson's comments on the bonus plan. It states:

"George felt that Wilson's analysis was not a sound one, which by the way I think we might discuss when opportunity affords, but what worried Whitney particularly was the thought he sensed some bitterness on Wilson's part on the relationship of management to stockholding interests. He suggested that I might explore the matter somewhat further with Wilson.

"I am not sure that this impression is a correct one, though Whitney did talk with Wilson at greater length after lunch. As we all know, Wilson is very earnest and very insistent and intent in trying to get over his viewpoint and may sometimes use certain arguments which appear to be somewhat overdrawn. But if there is anything in George Whitney's viewpoint it certainly would be desirable to endeavor to arrest such a feeling before it proceeds too far.

"My reason for bothering you about this matter at this time is that Wilson is making a talk at your meetings over there and you may have an opportunity of discussing this subject with him."

The letter then continues with respect to the advisability of the appointment of McLucas to the Board,—

"Wilson seeming rather anxious to do the thing promptly."

Carpenter stated he felt McLucas

"is in a large measure unqualified because of his present age, though that handicap is somewhat offset by his already considerable familiarity with General Motors. On the other hand, McLucas' handling of the recent Bank of Detroit stock matter has not particularly impressed me with his fitness for the job. * *"

Defendants assert that Carpenter, Sloan and Wilson all testified and could have explained what Wilson had intended in reference to the bonus plan; that in fact Wilson "was not referring to the du Ponts but was disturbed over the current tax situation which did not permit management to increase its stock holdings and thus participate in the earnings being produced by management to an extent comparable with the benefits enjoyed by the stockholders"; that this explanation is not in the record because the defendants were "tricked into assuming GTX 1347 was not a part of the government's case since it had not been used in the main case." The same assertion is made regarding the text discussing McLucas; that it was his age that kept him off and that Sloan and management were in agreement on this.

The evidence the government introduced in its case in chief relating to the promulgation, discussion of the plan, the recipients of the awards, the features attendant on partial liquidation of Managers Securities, the minutes of certain meetings of General Managers Securities Company and the du Pont Company holding the du Pont General Motors stock, were all directed to show that du Pont participated in the plan adopted by General Motors. The issue of "responsiveness on the part of General Motors executives to du Pont wishes" was a part of the allegations contained in paragraphs 53, 54 and 55 of the Amended Complaint. The court is of the opinion that the objection to this exhibit is well-taken particularly as it refers to the bonus plan; that opportunity to explain should have been allowed and to admit this exhibit into evidence without such an opportunity would be prejudicial to the defendants. The objections of the defendants are sustained.

### GTX 1348

Lammot du Pont, Chairman of the Board of du Pont, who had been a member of the Executive Committee of General Motors from 1930–1934, resigned as a member of that Committee. In connection with his resignation, Sloan wrote to Lammot du Pont inquiring whether he would like to have Carpenter

elected in his place. This exhibit reads as follows:

"We were discussing this afternoon the constitution of the Executive Committee and, naturally, the subject came up of your desire to withdraw from the activities of that Committee. * * *

"The purpose of this letter is to ask whether it would be your pleasure for us to extend the invitation to Walter. Everybody thinks very highly of Walter's judgment; he has always been interested in our problems, and we would like very much to have him join the Committee and continue the relationship just as you have, if that should appeal to Walter and yourself.

"I recognize that the principle you have in mind would apply to Walter just as much as it does to yourself, and that is the reason why I havn't advanced it before, but in the hopes of trying to accomplish something in the direction we all think is desirable, I am advancing it at this time specifically. If this should be acceptable to Walter and yourself, there is no reason why it should interfere with the presentations we are arranging to make to such group in Wilmington as you may wish to get together from time to time to deal with them."

The letter has been objected to by the defendants on the ground of the impeachment and non-rebuttal character of the exhibit. The government contends that it is proper rebuttal evidence since in assembling personnel for management responsibility existing in the Executive Committee, Sloan testified that management directors were always nominated by him "when they achieved in the management hierarchy of the corporation a position which entitled or required that they be on one of the committees of the Board". In addition, the defense have introduced GM 15-16 to show that Sloan's activities as a director of the du Pont Company was limited to the attendance of very few du Pont Board meetings.

The Government asserts GTX 1348 was introduced to rebut the inference that Sloan selected members of the Executive Committee free from du Pont influence and that he could not be cognizant of du Pont desires as to General Motors because of his inactivity on the du Pont Board; that this exhibit establishes there existed a prevalence of "informal" meetings between Sloan and the top echelon executives of the du Pont Company.

The court is of the opinion the exhibit should be allowed as rebuttal evidence. The objections of the defendants are overruled and the exhibit is received in evidence.

### GTX 1367, 1368

GTX 1367 is a report of the du Pont Cellulose Department of May 15, 1922 and GTX 1368 is a report of the du Pont Paint, Lacquer and Chemicals Department of December 23, 1926. These reports were made to the Executive Committee of du Pont. They are offered by the government to rebut the testimony of A. E. Brown that du Pont's only concern in the fabrics field was with reference to color matching which caused loss of accounts (4558) and Irenee du Pont's denial of any knowledge of competitiors selling below cost in an effort to compete with du Pont. (2318). These two exhibits refer to a fabric competitor selling his product below cost. GTX 303 introduced by the government in its case in chief refers to a competitor indulging in such a practice.

The objection of defendants is that these documents are not rebuttal evidence.

These two additional exhibits are cumulative to evidence introduced in the case in chief. The court is of the opinion that the defendants will not be prejudiced by the reception of these exhibits as rebuttal evidence.

The objections of the defendants are overruled and the exhibits are received in evidence.

### GTX 1375–1386

■ These twelve exhibits consist of excerpts from annual competitive reports made by the du Pont Fabrics and Finishes Department to the Executive Committee for the years 1935–1941, 1946–1950. The government states each was obtained pursuant to subpoena in the closing days of the trial when defense witnesses testified as to the existence of these reports. They are offered to rebut the evidence of the defense on trade relations in fabrics and finishes between du Pont and General Motors.

Richard C. Williams, a du Pont employee, testified as to why General Motors did not purchase some of the automobile finishes listed in defense exhibit DP 176 stating he knew of no reason why it was not buying from du Pont except "quality, service and price". (4233). Exhibits GTX 1375, 1376 and 1379 state that loss of General Motors thinner business was due to the adoption by General Motors of a new formula for 1935, and the improvement in the quality of Duco requiring less thinner for the years 1936 and 1939. Exhibits GTX 1377, 1378, 1380, 1381 and 1382 state that du Pont's decrease or increase in sales to General Motors, as the case may be, was due to General Motors competitive position in the market. For example, GTX 1382 states that in 1946 the strike in the General Motors plants reduced the competitive position of General Motors and therefore du Pont's sales were also affected. Exhibits GTX 1384, 1385 and 1386 are directed to the same issue; that in 1948 80 per cent of du Pont fabric sales were made to General Motors; in 1949 due to unduly low prices of competitors loss resulted in part of the General Motors fabric business; and in 1950 increased due to General Motors tremendous production.

Exhibits GTX 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1384, 1385 and 1386 are also directed to show the reasons for the reduction in the supply of fabrics—that is, adoption of the all steel top in automobiles and the reduction and subsequent increase of pyroxylin coated materials due to the introduction of rubber coated fabrics and the final adoption of pyroxylin fabrics as interior trim. The government asserts these are introduced to rebut the testimony of Brown and Nickowitz and defense charts DP 297, 298, 305–6, 307–8, 311–2, directed to show a reduction of fabric sales to General Motors.

Defendants' objections to these exhibits are that they are not rebuttal evidence and seek to impeach the defense witnesses by showing that their reports are inconsistent with their testimony without the laying of any foundation.

The objections of the defendants are overruled and the exhibits are received in evidence.

### GTX 1395

The government has introduced a copy of a letter represented to be written by William C. Durant. By way of stipulation with the defense, the government has established that this copy was taken from the personal files of Durant, which files are in the custody of his widow. Also, by stipulation, the government has established that one Murphy, personal secretary to Durant during the time of the writing of this letter, has identified the letter from the format and contents thereof, and the initial "W" in the lower lefthand corner as a letter dictated by Durant to his then stenographer, Miss Weiller. It was stipulated that Murphy stated that in the ordinary course of business Miss Weiller took dictation of letters from Durant, typed such letters, retaining copies thereof for filing purposes, and mailed such letters.

The copy of the disputed Durant letter is directed to Irenee du Pont, dated March 16, 1921, and reads as follows:

"I notice in the annual report of the E. I. duPont de Nemours & Co., signed by you, which has been given considerable publicity, the following personal reference:

"'He desired to resign and sell his interest in the Corporation to liquidate his personal indebtedness which was very large and pressing.'

"There is evidently some mistake and I feel that I should acquaint you with the facts:

"On the evening of November 15th, a personal friend of mine, representing the duPont interests, called at my apartment and informed me that my resignation as President of the General Motors Corporation was desired and would be accepted—the reason given, that I was not in sympathy with the policies of the controlling interests and would not cooperate. I must and do plead guilty to the charge.

"Two days later, when I came to discuss the matter with Mr. P. S. duPont and Mr. Raskob, I told them (and up to that time they knew nothing of the situation) of the burdens which I had assumed in attempting to correct the mistakes and errors which had been made, for which I was in no way responsible, and from that point we started to work out a plan which would relieve me of my embarrassment and which resulted in the duPont Securities Co. taking over my General Motors holdings.

"In our attempt to adjust to the new conditions, I trust nothing will occur to destroy our friendship."

The government states it has introduced this copy for the purpose of rebutting the defense position that Durant took his financial loss and his forced resignation from General Motors in good spirits. In defense exhibit DP 50, a letter written by Pierre du Pont to his brother, Irenee du Pont, on November 26, 1920, the circumstances of the purchase of Durant's holdings and resignation are set forth; and on page 10 thereof reference is made to the fact that these negotiations involving Durant were "all in good spirit." In addition, the government asserts it is offering the document as a statement made by Durant, who until 1920, was the chief officer of one of alleged conspirators in this case—General Motors. The letter is offered to demonstrate that Durant believed and recognized that his elimination from General Motors was the result of improper pressure brought by those who were in a position, as a result of the unfortunate coincidence of Durant's personal financial difficulties, to force his resignation. The ultimate facts as to the circumstances of Durant's elimination from General Motors are asserted to be for the court to determine. Thus, it is not offered to prove the truth of the facts asserted in the letter, but merely to show Durant's belief that the assertions were true.

The defendants' objections are that the document is hearsay and therefore inadmissible and that the authenticity of the document as being written by Durant was also questionable. Defendants contend that it is a declaration by a stranger to the litigation who is not available for cross-examination, that Durant's belief has no significance except as a foundation for an inference that the conduct believed to have occurred did in fact occur, and the ultimate purpose of the evidence is to prove not the belief but the fact of the conduct. It is also asserted that ambiguities in the language of the letter, without cross-examination, establish conclusions which are nothing more than the writer's conclusions and opinions.

█ The court is of the opinion that the evidentiary requirements have been met for the introduction of this letter as a copy written by Durant and mailed to the addressee.

█ More disturbing is the objection that the document is a hearsay declaration. Courts will not receive the testimony of a witness as to what some other person told him as evidence of the existence of the facts asserted even though it consists of a statement based on his own knowledge. This rule is applicable to documentary evidence; that is, letters written by a third person under circumstances which do not render them binding on the party against whom they are offered and where offered to prove the truth of the recitals therein. Such documentary evidence is not admis-

sible to show the truth of the recitals therein.

Wherever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it. The condition of the speaker's mind, as to knowledge, belief, or the like, may be evidenced by his utterances as assertions or considered circumstantially as affording indirect inferences. Therefore on this principle the hearsay rule interposes no obstacle to the use of letters, or any form of verbal utterances by one person as circumstantial evidence showing a state of mind. Such a declaration, however, is to be received only as circumstantial evidence to show the fact of the utterance indicating the state of mind or intent, but are not to be used to prove the truth or correctness of such statement. Wigmore on Ev., Vol. VI §§ 1788, 1789, 1790. In addition, rules of evidence relating to admission or exclusion of evidence are intended primarily for the purpose of withdrawing from a jury matter which might improperly sway the verdict and not for the trial judge who is presumed to act only on proper evidence and questions regarding admission or exclusion of evidence are relatively less important in a case tried to the court without a jury. Mac-Donnell v. Capital Co., 9 Cir., 1942, 130 F.2d 311, certiorari denied 317 U.S. 692, 63 S.Ct. 324, 87 L.Ed. 554.

For the limited purpose then of showing a belief and state of mind, the court is of the opinion the document may be received. The objections of the defendants are overruled, and the letter is received in evidence.

### GTX 1396

This exhibit is a report of the du Pont Fabrics and Finishes Department for April 1931, and states on page 3 that Opel, the German automobile subsidiary of General Motors, transferred its pyroxylin lacquer business from I. G. Farben to du Pont's subsidiary at no price reduction as a result of "pressure from General Motors officials" brought to bear upon Opel. The government asserts that this evidence follows the same pattern causing adoption of Duco a few years earlier by General Motors in the United States. (GTX 377-8; Irenee du Pont 2367). It is urged that this exhibit is admissible to show intent and also proper to show the propensity of the parties to commit the acts alleged in the present suit.

The defendants aver that General Motors witnesses would have testified whether or not the hearsay surmise was accurate and if it was the reason for the change to Duco by Opel. The court is of the opinion the objection is well taken. The objection of defendants is sustained.

### GTX 1404

Mr. Sloan was asked whether du Pont ownership of shares in General Motors "has necessarily affected the relationship between the two companies so that they have become, as you expressed it in one of your letters, one family?". He replied in the negative. (3208). In addition, he later testified that "all transactions were at arm's length based upon the interests of all stockholders in General Motors and no other considerations entered into it so far as business judgment goes." (3212) Other defense witnesses testified to the same effect.

This exhibit is offered to rebut this testimony. It is a letter, dated September 27, 1930, from F. O. Clements, Technical Director of General Motors Research Laboratories to E. K. Bolton, Chemical Director of du Pont, referring to certain developments General Motors had made along lubrication lines, and Mr. Clements stated:

" * * * I think we can open up to you quite freely.

"We know of no one to whom we would prefer to extend this courtesy, more than your own organization, for we look upon duPonts as sort of grandpa to General Motors."

The defendants state that this exhibit does not refer to any stock investments at all; that the real purpose for which it is offered is to use the letter as proof that General Motors turned over to du Pont developments in the lubricating oil field and offered it as further proof that General Motors turned over its chemical discoveries to du Pont for development and exploitation. The defendants assert that no opportunity to meet this charge was given in order to show that the lubricating research results were turned over to the oil companies and not to du Pont.

For the limited purpose for which this exhibit is proffered by the government— that is, the relationship between du Pont and General Motors—the court will admit the exhibit. The objections of the defendants are overruled and the exhibit is received in evidence.

### Statistical Exhibits

GTX  1343A,  1343B,  1344,  1387, 1393,  1394,  1400, 1389  – 1392 and 1388

DP 568–573

The court now considers the seventeen charts which have been submitted by the government and the defendants. The purpose underlying their submission is to show the ultimate precentage of business transacted between General Motors and du Pont and its competitors. The charts deal with fabrics, finishes, anti-freeze, adhesives, anodes and chemical solvents.

The accuracy of these respective charts have been challenged and are the primary basis of the respective objections to their admissibility. All of these charts, government and defense, are premised on basic data and figures contained in tables prepared and submitted by General Motors and du Pont in response to grand jury subpoena. As to these basic tables the sole defense objection to their admissibility relates to their character as "rebuttal" evidence. These tables, GTX 1343A and 1344, were prepared by the government from informa-

tion and figures divulged during the investigation preceding the filing of this action in compliance with grand jury summons.

The admissibility of GTX 1343A, 1343B and 1344 must therefore be determined before proceeding to objections on the respective charts prepared by both parties from them.

GTX 1343A is a table showing dollar volume purchases made by General Motors from suppliers other than du Pont in fabrics and finishes for the years 1946, 1947 and the first half of 1948. GTX 1343B is a list sent to all General Motors Divisions by the Comptroller of General Motors instructing them as to what items should be considered in listing competitive products. GTX 1344 is a table of sales by du Pont by product and dollar volume to General Motors for 1938–1941, 1946–1947.

The government asserts that because of initial difficulties with these tables they were not introduced by the government in its case in chief. These difficulties were: First, it appeared that identical products could not be extracted from the product listings on the tables so as to subject the sales and purchases for such products to comparative scrutiny; Second, it appeared that no proper determination could be made from GTX 1343A as to whether those companies listed as General Motors suppliers were in truth competitors of du Pont in that they supplied a product similar to one made and sold by du Pont. It is stated that as the trial progressed and as the government learned more about the products involved from the testimony of witnesses and from defense exhibits, the two tables became more intelligible. The court is of the opinion these basic tables should be allowed. The objection of defendants to GTX 1343A, 1343B and 1344 are overruled and they are received in evidence.

With respect to the charts prepared by both parties from these basic tables, the primary objection by the re-

spective parties is directed to accuracy in their preparation.

Percentages may be considered as an additional factor, with myriad other circumstances in the evidence of alleged market control and the fact of control.

The court is of the opinion the charts, compilations and tables should be admitted in evidence and their evidentiary value will be considered where pertinent. The objections of the parties relating to their accuracy are overruled and the exhibits are received in evidence.