UNITED STATES of America

v.

NU–PHONICS, INC., et al., Defendants.

Crim. No. 680941.

United States District Court,
E. D. Michigan, S. D.

June 20, 1977.

David F. Hils and Susan B. Cyphert, U.S. Dept. of Justice, Cleveland, Ohio, Kenneth J. Haber, Asst. U.S. Atty., Detroit, Mich., for the U.S.

Richard Zipser, Southfield, Mich., for Nu-Phonics, Inc. and Sheldon Irwin Segel.

William J. Weinstein, Detroit, Mich., for Lucas, Inc. and Kenneth Edward Lucas.

William A. Sankbeil, Detroit, Mich., for Ferndale Hearing Aid Center, Inc. and Frank Ellwood Johnson.

Clyde B. Pritchard, Detroit, Mich., for Eastside Hearing Aid Center, Inc., Donald E. Hovarter and Daniel F. Bifano.

Alan R. Miller, Birmingham, Mich., for Madeline Jamieson.

Royal G. Targan, Dearborn, Mich., for Murray Davis Peppard.

David R. Kratze, Southfield, Mich., for Allan M. Kazel and William T. Lafler.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This is a case under Section 1 of the Sherman Act, 15 U.S.C. § 1, in which the defendants, who are all Detroit area hearing aid dealers, have been charged with conspiring in a price-fixing scheme. The government has moved *in limine* for the exclusion of certain evidence on the ground that it is irrelevant because the offense charged is a *per se* violation of the Sherman Act.

This case is one of the first, if not the first case, to come to trial under the new felony antitrust law. In 1974, Congress changed violation of the Sherman Act, 15 U.S.C. § 1, from a misdemeanor, carrying a maximum penalty of one year imprisonment, to a felony, carrying a maximum penalty of three years.

Mindful of this drastic increase in penalty and in the collateral consequences of conviction (*e. g.*, felony convictions often prevent licensing, while misdemeanor convictions do not), the court, in responding to the government's motion *in limine,* has attempted not only to apply the law as it has been developed over more than 75 years during which violation of the act was only a misdemeanor, but also has made an effort to begin the process of making certain that persons charged with a felony antitrust violation are given the same protections as persons charged with more traditional felonies.

The indictment charges that the defendants combined and conspired "in unreasonable restraint" of trade, the substantial terms of the conspiracy being:

"(a) to refrain from giving price quotations for hearing aids over the telephone;

"(b) to refrain from advertising prices for hearing aids; and

"(c) to charge $180 over cost for all State business."

The indictment charges, further, that the alleged conspiracy had the effects of fixing, raising, and maintaining prices for hearing aids in the Detroit area at artificial and

noncompetitive levels; of restraining and eliminating competition in the sale of hearing aids in the Detroit area among the defendants and co-conspirators; and of depriving purchasers of hearing aids in the Detroit area of the benefits of an open and competitive market.

On the basis of the charge made in the indictment, the government seeks to exclude, as a matter of law, defense evidence offered to show: (1) that the agreement was ineffective or unsuccessful, including telephone records, price quotations, newspaper advertisements, and records of hearing aid sales to the state before, during, and after the conspiracy; (2) that the price of $180 over cost was a reasonable charge to the state, including evidence of actual selling and servicing costs, and business profits and losses; and (3) justification or excuse for the agreement, including evidence of collusion between dealers and audiologists, of the illegality of the state's purchasing policies, and of the state's determination that $180 over cost was a fair price for a hearing aid.

■ The court finds no fault with the government's principal abstract propositions of law. Nobody would argue that price-fixing is not a *per se* violation of section 1 of the Sherman Act, and none of the defendants have taken that position in opposition to the government's motion. No agreement is more clearly an unreasonable restraint upon trade than an agreement among competitors to fix their prices, and such agreements have been *per se* violations of the Sherman Act since the early history of the Act. See *United States v. Trenton Potteries,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *American Tobacco Co. v. United States,* 147 F.2d 93 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

■ A "price-fixing" agreement is "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate commerce." *United States v. Socony-Vacuum, supra,* 310 U.S. at 223, 60 S.Ct. at 844. A direct price-fixing agreement is one in which prices are expressly or tacitly agreed upon. The anticompetitive purpose of direct price-fixing agreements is evident and such agreements are therefore, without more, unreasonable restraint of trade. *Trenton Potteries, supra.*

■ Illegal price-fixing also may be achieved by indirect means. An agreement among oil dealers to buy up the surplus oil of the independents for the purpose of preventing price depression is a form of price-fixing, and therefore a *per se* violation. *Socony-Vacuum, supra.* An agreement among car dealers fixing a voluntary list price and circulating that list among the members of a dealer association was held to be price-fixing, and therefore a *per se* violation. *Plymouth Dealers' Association of Northern California v. United States,* 279 F.2d 128 (9th Cir. 1960). An agreement among local gasoline retailers to refrain from price advertising to stabilize the local market by preventing price wars was held to be price-fixing, and therefore a *per se* violation. *United States v. Gasoline Retailers Association, Inc.,* 285 F.2d 688 (7th Cir. 1961). A professional association's ban on price competition among its members by competitive bidding also was held to be a price-fixing agreement. *United States v. National Society of Professional Engineers,* 555 F.2d 978 (D.C. Cir. 1977).

■ On the other hand, the existence of price uniformity among competitors, is not, in itself, sufficient evidence of price-fixing. *North Carolina v. Chas. Pfizer & Co.; Inc.,* 537 F.2d 67 (4th Cir.), aff'g, 384 F.Supp. 265 (E.D.N.C.1974), *cert. denied,* 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976); *see Continental Baking Co. v. United States,* 281 F.2d 137 (6th Cir. 1960). "The antitrust laws were not meant to prohibit businessmen from adopting sound business policies merely because competitors had already adopted the same or similar policy." *Chas.*

*Pfizer, supra,* 537 F.2d at 76. Nor have the courts recognized a concept of "constructive price-fixing," in instances where increased price or price stabilization is a natural and probable consequence of cooperative action among competitors which is unrelated to price. *Arizona v. Cook Paint and Varnish Co.,* 391 F.Supp. 962 (D.Ariz.1975), *aff'd* for the reasons stated by the district court, 541 F.2d 226 (9th Cir. 1976) (cooperative false advertising among competing manufacturers).

■ A conclusion that a particular course of action is a *per se* violation of the Sherman Act is not quickly made. "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). "[T]he area of *per se* illegality is carefully limited. We are reluctant to extend it on the bare pleadings and absent examination of market effect and economic consequences." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 178, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). If, after such examination, the activity has been shown to have a "pernicious effect on competition and lack[s] any redeeming virtue," it will be deemed unreasonable *per se. Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ Once it has been determined that a particular course of action was a price-fixing conspiracy which affected interstate commerce—a *per se* violation of section 1— there is virtually no defense. The reasonableness of the price fixed is immaterial, as is any benevolent or constructive motivation for the scheme. *Socony-Vacuum, supra.* It matters not at all that governmental employees knew of the unlawful scheme and winked at it or approved it. *Id.* 310 U.S. at 226, 60 S.Ct. 811. It is unavailing to the defendants that they did not control the market, that enforcement procedures were lacking, or that some participants did not always honor the plan. *United States v.*

*Real Estate Boards,* 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).

The government in this case asks the court to exclude significant defense evidence because the activities charged in the indictment are price-fixing schemes as a matter of law. This argument must be rejected for the simple reason that to so hold would establish a violation of section 1 without proof of all the essential elements of the offense.

■ In *every* criminal price-fixing case, the government must prove: (1) that there was a conspiracy; (2) that its purpose was to fix or stabilize prices; and (3) that it had "the effect of raising, depressing, fixing, pegging or stabilizing" prices. *See Socony-Vacuum, supra,* 310 U.S. at 219–20, 223, 60 S.Ct. at 844.

■ (1) To prove any of the three parts of the conspiracy alleged in the indictment, the government may introduce any evidence tending to establish that the defendants agreed to pursue a common design or objective, "whether acting separately or together, by common or different means," or by acts which themselves were entirely innocent. *American Tobacco Co. v. United States, supra,* 147 F.2d at 107. The government will be given the "great latitude" that is traditionally thought necessary in antitrust cases "to develop fully the background of facts out of which the alleged conspiracy arose and in which it operated." *United States v. E. I. DuPont de Nemours and Co.,* 126 F.Supp. 27, 29 (N.D.Ill.1954). The defendants should be entitled to no less. *Continental Baking, supra.*

■ (2) The nature of the government's burden, in proving anticompetitive purpose, depends upon which type of price-fixing is charged. The anticompetitive purpose of an express or tacit agreement to fix prices—*i. e.,* a direct price-fixing conspiracy—is apparent from the very nature of the agreement, and no other proof of purpose is required.

On the other hand, agreements which merely create the potential power for price

maintenance must be shown to be price-fixing agreements. See *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). The anticompetitive purpose of such an agreement is not apparent, and therefore it must be proved. It must be shown that the defendants joined together *for the purpose* of fixing prices. If this requirement were not preserved, business people would be guilty of price-fixing whenever any of their concerted action has the natural and probable consequence of causing increased, decreased, or stabilized prices. Such a theory of "constructive price-fixing" was rejected before violation of the Sherman Act became a felony. *Arizona v. Cook Paint, supra; see International Rys. of Central America v. United Brands Co.*, 532 F.2d 231, 240–41 (2d Cir.), *cert. denied*; 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976); *cf. Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d 506, 513–15 (6th Cir. 1972). Surely it must be rejected now that a violation of the Act is a felony.

■ No law has been cited to the court, and the court has found no law that would support the injection of a conclusive presumption of anticompetitive purpose into cases that do not clearly involve direct price-fixing. It is immaterial that a refusal to advertise prices, which is part of the conspiracy alleged in this case, has been found to be a price-fixing scheme in the past. *See, e. g., United States v. Gas Retailers, supra.* When an indirect price-fixing scheme is charged, each case must be decided on its own facts, and the proof must show, in each case, that the concerted activity involved had a price-fixing objective.

■ It cannot be maintained seriously that the court *must* determine from the allegations of the indictment that the purpose of the alleged agreements to refuse to advertise and to quote prices over the telephone was to fix prices. It is conceivable that the agreements alleged in the indictment had an innocent objective. For instance, it is conceivable that these agreements reflected a concerted decision among the defendants that because each customer must be tested and fitted personally before the appropriate hearing aid can be identified, the defendants would all save time and money and minimize customer confusion by refraining from quoting prices until after testing and fitting in each case. The court intimates no opinion in this matter. It holds, rather, that where an indictment charges a course of conduct that may have an innocent objective, the court will not impute a felonious one.

■ Accordingly, the anticompetitive purpose of those alleged agreements not directly setting or fixing prices will have to be proved. The defendants may rebut the government's evidence of anticompetitive purpose with any relevant evidence of their own. As in the usual conspiracy case, the jury may infer an unlawful objective from all the circumstances surrounding the defendants' actions and from the actual or foreseeable economic effects of the defendants' actions. The anticompetitive purpose of the alleged agreement to charge $180 over cost for each hearing aid sold to the state is apparent from the nature of the agreement, and no evidence is needed to establish the illegal purpose of that agreement. There is no evidence other than that which will negate the existence of the agreement itself which can defeat an anticompetitive purpose of an agreement directly to fix or establish prices.

■ (3) In considering the "effects" part of the government's burden:
"The test is not what the actual effect is on price, but whether such agreements interfere with 'the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.'"
*Plymouth Dealers, supra*, 279 F.2d at 132.
As was shown in connection with anticompetitive purpose, a distinction must be drawn between the government's burden of proving the restraint upon trade of agreements or conspiracies that directly fix or establish prices, and its burden of proving the restraint caused by agreements or conspiracies that may have such an effect indirectly.

As to that part of the charged agreement which involves the alleged fixing of prices for state business at $180 over cost, the showing of the agreement itself is a sufficient showing of interference with the freedom of the marketplace and can be rebutted only by evidence tending to negate the agreement.

However, proof establishing the existence of an agreement not to quote prices over the telephone and not to advertise prices does not in and of itself evidence interference with the freedom of the marketplace. Something more is needed. *See, e. g., United States v. Container Corp., supra.* Clearly, the court must permit the defendants to produce evidence that tends to establish that such an agreement did not have "the effects of raising, depressing, fixing, pegging or establishing" prices as it has relevance to the charge in the indictment:

"(a) prices for hearing aids in the Detroit area have been fixed, raised and maintained at artificial and non-competitive levels;

"(b) price competition between the defendants and co-conspirators in the sale of hearing aids in the Detroit area has been restrained and eliminated; and

"(c) purchasers of hearing aids in the Detroit area have been deprived of the benefits of purchasing hearing aids in an open and competitive market."

Paragraph 13 of the Indictment.

The defendants in this case have the right to establish by any and all relevant evidence that there was no agreement; that they were not participants in an agreement; that the refusals to advertise and to quote prices by telephone, if they existed, did not have an anticompetitive objective or purpose; that their actions had no anticompetitive effects, as defined herein; and that their actions were not in or did not affect interstate commerce, as required by the Sherman Act. They must be given the opportunity to present all relevant evidence in support of any defense which is open to them. The jury must be free to draw its own inferences from the evidence, in ac-cordance with the instructions which will be given to it. *Continental Baking, supra,* 281 F.2d at 143.

Telephone records, price quotations, newspaper advertisements, records of sales to the state, and evidence of sales and servicing costs may all be relevant to a defense that the alleged conspiracy did not exist or that particular defendants were not involved in it and will not at this time be eliminated from the case.

The indictment in this case charges a conspiracy that existed approximately three months. There are finite points in time both before the formation of the alleged conspiracy and after its termination beyond which economic evidence has limited value. F.R.E., Rule 403. Therefore, evidence will be presumed irrelevant if it is derived from or bears upon a time more than six months before or six months after the time period of the conspiracy charged in the indictment; this presumption will be rebuttable.

For the reasons set forth above, the government's motion *in limine* is granted in part and denied in part and the evidence will be received in accordance with the principles stated herein.

The foregoing analysis of the nature of the evidence required to establish and permissible to rebut criminal price-fixing in violation of section 1 of the Sherman Act was made in the context of the 1974 amendment to the Act, changing violations from misdemeanors to serious felonies. This transformation of Sherman Act violations warrants careful re-evaluation of the nature of proof that until 1974 had been thought sufficient to establish the offense.

Antitrust crime is white collar crime, and many segments of society demand that white collar felons be treated comparably with other felons. A recent report of the Committee on Economic Crime of the American Bar Association Section on Criminal Justice reports:

"The Committee recommends that a greater emphasis to be placed on punishing economic crime offenders following their conviction.

"It is the consensus of the Committee that the most effective punishment for the economic crime offender is incarceration. . . ." P. 22.

As convicted violators of the Act henceforth will be felons, suffering all the collateral consequences of felony convictions as well as substantial penalties, they should be accorded all the rights that are usually accorded accused felons. Most fundamentally, they should have the benefits of the burden of proof usually imposed on the government in felony cases. In light of the change in the Sherman Act violation, the settled Sherman Act law of *mens rea* and overt acts deserve reconsideration. In the usual section 371, Title 18 case, proof of a felonious conspiracy requires proof of specific intent and proof of an overt act in furtherance of the conspiracy. It may be time to read these requirements into criminal prosecutions under the Sherman Act.[1]

In deciding the government's motion *in limine* in this case, the court felt bound by existing Sherman Act law. However, the court has attempted to interpret and apply that law in a way that protects the accused, and it will continue to do so throughout the trial of this case.

So ordered.

---

1. Footnoted material referred to on page 16 of the Memorandum Opinion and Order.

The distinction being urged here between the burden of proving civil and criminal violations of section 1 of the Sherman Act is well illustrated by *United States v. Container Corp. of America, Inc., supra.* In that case, a civil proceeding, an informal tacit agreement among competitors to exchange price information on their charges to specific customers was held to be price-fixing. This holding was based on the economic effects of the arrangement—viz., the stabilization of market prices. In other words, otherwise neutral activities became an unlawful price-fixing scheme because of their economic effects. Evidence in the record indicated that the defendants actually may have exchanged price information so that they could undercut each other. If in fact the defendants were exchanging price information in order to undercut the competition, then clearly they did not have a specific intent to fix prices, and they should not be subject to felony penalties. Had Container Corp. been a criminal proceeding brought after the 1974 amendment, this evidence should have been admitted as weighing against any inferences of anticompetitive intent which could be drawn from the foreseeability of price stabilization.