281 F.2d 137
 CONTINENTAL BAKING COMPANY, Appellant,
v.
UNITED STATES of America, Appellee.
AMERICAN BAKERIES COMPANY, Appellant,
v.
UNITED STATES of America, Appellee.
COLONIAL BAKING COMPANY OF MEMPHIS, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 13865-13867.
 United States Court of Appeals Sixth Circuit.
 July 18, 1960.
 
 A. Longstreet Heiskell, C.P.J. Mooney, John M. Heiskell, Memphis, Tenn., for appellants.
 Ramsay Wall, Shepherd, Heiskell, Williams, Beal & Wall, Memphis, Tenn., Roy M. Anderson, and George Faunce, Jr., Rye, N.Y., on the brief, for appellant Continental Baking Co.
 C.P.J. Mooney, Memphis, Tenn., on the brief, for appellant American Bakeries Co.
 J. Clyde Mason, Canale, Glankler, Montedonico, Boone & Loch, Memphis, Tenn., on the brief, for appellant Colonial Baking Co.
 Earl A. Jinkinson and Raymond D. Hunter, Dept. of Justice, Anti-Trust Division, Chicago, Ill. (Raymond P. Hernacki and Richard A. Solomon, Dept. of Justice, Anti-Trust Division, Washington, D.C., and Rives A. Manker, U.S. Atty., Memphis, Tenn., on the brief), for appellee.
 Before CECIL and WEICK, Circuit Judges, and KENT, District Judge.
 WEICK, Circuit Judge.
 
 
 1
 On May 7, 1958 an indictment was returned against the Continental Baking Company, American Bakeries Company, Hart's Baking, Inc., and Colonial Baking Co. of Memphis charging them in one count with violation of Section 1 of the Sherman Act (15 U.S.C.A. 1). The nature of the offense charged was a continuing conspiracy for many years resulting in the fixing and stabilization of uniform and non-competitive prices of bakery products in the Memphis, Tennessee area. Thereafter defendant Hart's entered a plea of guilty and was fined $3,500. Trial was commenced against the remaining defendants, appellants herein, on December 8, 1958 and on December 18, 1958 the jury returned a guilty verdict as to all three defendants. Fines were imposed in the following amounts: $42,500 on Continental, $35,000 on American and $32,500 on Colonial.
 
 
 2
 In this Court ten questions have been presented by both Continental and American and six by Colonial. Many of the questions are identical and several issues overlap. All errors assigned will be considered under nine subject headings.
 
 
 3
 I. The Nature of the Government's Proof and Exclusion of Defendants' Explanatory Evidence
 
 
 4
 The prosecution sought to prove that the defendants had acted in concert in raising and maintaining the price of bakery goods in the Memphis area. The nature of the Government's proof went beyond a mere showing that the prices charged by the defendants for various items were the same, and that each raised its prices the same amount at the same time. Evidence was introduced that preceding each price change representatives of the defendants had met together and discussed prices. It is claimed that the meetings were held to reach, and resulted in, illegal agreements fixing the price of the bakery goods manufactured by the defendants. Thus, the Government contends it has proved its case of conspiracy by direct and positive evidence.
 
 
 5
 Appellants entered pleas of not guilty. They denied that the price increases were the result of any agreements, but rather that the products of the bakery industry are standardized and uniform prices and contemporaneous price changes are the rule, rather than the exception. In support of this claim the defendants offered proofs of similarity of costs, operations, marketing procedures, and other economic factors affecting price changes, alleged to be common to all, and had expert witnesses to testify in support of their theory. In essence, the defendants sought to show that they were following an economically dictated practice of conscious parallelism of prices, rather than engaging in any illegal conspiracy to fix prices.
 
 
 6
 The District Court excluded all such proffered evidence. The reason for so doing is found in the following statement made by the Court to counsel:
 
 
 7
 'Well, gentlemen, the defendants as we all understand are charged with having conspired to fix prices. We are dealing here with a matter of proof as the Court understands it, what proof may be received on that charge in the trial of this case.
 
 
 8
 'Now, as to the evidence, the Government has closed its case and we heard evidence here for a week; we heard the testimony of the responsible officers of at least two of the codefendants, defendant corporations, and the evidence shows that the responsible officials of the company and all of them held meetings in hotel rooms and in other places at which time they discussed and definitely agreed upon price increases of their bakery products, the amounts of such increases on the various products and the particular defendant which would lead off or first announce the price change.
 
 
 9
 'Following these meetings over this period of time, the defendants did in fact raise their prices in the manner and to the extent agreed upon at the meetings. Now, under the law as the Court understands the law, and I have in mind in particular the cases discussed here this morning, among others the Socony Vacuum case, the testimony concerning cost factors and the testimony of an economist which the defendants are proposing to introduce, cannot serve to rebut this price fixing evidence. As they say in those cases, where the justification or motive, whether economic, benevolent or otherwise, that price fixing agreements may be said to have, the law does not permit any inquiries into their reasonableness.
 
 
 10
 'So in view of all that, any testimony concerning cost factors or testimony of an expert economist along those lines in the Court's opinion would be wholly immaterial and inadmissible in evidence.
 
 
 11
 'It does present a problem; as we go along, we will have to deal with it in the proof as best we can. While the defendants may controvert, of course, the Government's evidence, if they can, they are and will be restricted to a considerable extent.
 
 
 12
 'Price fixing agreements are per se violations of the Sherman Act, p-e-r-i-o-d, and there is virtually no defense to a price fixing case, gentlemen.
 
 
 13
 'In a case like this, defendants will be permitted, as I said, to controvert the evidence of meetings which have been developed in the proof of any negotiations or conversations, but they will not be permitted to offer evidence concerning cost factors or other reasons for having a price increase. If they fixed prices, meaning they agreed to them, they are guilty as a matter of law, and there is no concern, as the Court had already pointed out, how necessary it was for them to raise the prices.'
 
 
 14
 The Government's theory in this Court is predicated on the proposition that in its case in chief the defendants' illegal activities were proven by direct and positive evidence and, therefore, the defense was precluded from its showing of economic causation.
 
 
 15
 The Government's evidence established that prior to each price increase during the indictment period representatives of the defendants had met together. Three Government witnesses testified as to what transpired at certain of those meetings.
 
 
 16
 Wayne Grout, President of Colonial, testified to the fact that at the meetings the question of prices would come up and one of the bakers would state he felt that his firm needed an increase in prices. The other bakers would agree that they too needed to raise prices, or, as Government counsel phrased it they 'did not object' to the suggestion. However, there was no testimony from this witness that the decision of any one of the defendants to raise prices was conditioned on the agreement that all would do so. He testified that at these meetings all the bakers agreed that a price increase was warranted, but he did not testify that they agreed to raise prices collectively. Rather, one of the bakers, generally the one who initiated the conversation concerning prices, would state that he was going up. When he in fact did go up the other bakeries followed, generally within a day ot two.
 
 
 17
 The testimony of L. S. Hartzog, President of Hart's, was similar to that of Mr. Grout concerning the discussions at the meetings. Of singular importance in his testimony was the following statement, made under cross-examination:
 
 
 18
 'Q. Now, actually was there any agreement, Mr. Hartzog? A. No, Sir.'
 
 
 19
 The third Government witness was John McCrory, Manager of Hart's Jackson, Mississippi plant. He testified to attending meetings at which the defendants were represented preceding price increases in December 1955, August 1954 and October 1953. His description of the conversations was substantially the same as that of the other two witnesses. He further testified that when the baker who stated he was going up told the amounts he proposed to raise his prices the others present copied the amounts down. He did not testify that he heard any agreement reached that all present would go up the specified amounts or that the one quoting prices conditioned his increase on the others following suit.
 
 
 20
 It is our opinion that by the testimony of these witnesses concerning the meetings and the evidence of the price increases by the defendants shortly thereafter the Government placed before the jury circumstances from which an inference that an illegal agreement had been consummated could be drawn. It cannot be said that the Government irrefutably established that such agreements were reached. None of the witnesses so testified and Mr. Hartzog stated that no agreements were entered into. The defendants denied that they entered into such agreements. It was for the jury to determine if, on all the evidence, together with the inferences to be drawn therefrom, the Government had proven its case.
 
 
 21
 The principle witness for the defense was Howard A. 'Buck' Humbrecht, plant manager for Continental in Memphis. He admitted to the various meetings, but denied that they were called for the purpose of, or resulted in, the reaching of price-fixing agreements between the defendants.
 
 
 22
 In ruling that the defendants' explanatory evidence of economic causation and conscious price parallelism was inadmissible on the grounds stated, the District Judge necessarily performed the function of the jury. He determined that the Government had established the ultimate fact- that the defendants had entered into price-fixing agreements. Whether or not a conspiracy to fix prices had been established was for the jury to say and the Court could not determine this issue as a matter of law. Cf. United Brotherhood of Carpenters & Joiners of America v. United States, 1947, 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973; Schwachter v. United States, 6 Cir., 1956, 237 F.2d 640, 644.
 
 
 23
 The situation presented here is that the Court limited the defendants to a naked denial of the Government's charges that they had entered into the price-fixing agreements alleged by the Government. The Court would not permit them to offer evidence in support of their defense that the prices resulted from uniform operating costs and economic factors and not from agreements.
 
 
 24
 The proffered evidence was circumstantial in nature, from which the jury could draw an inference that the price changes resulted from economic factors. The evidence admitted by the Court that meetings were held by appellants following which the price changes took place was also circumstantial evidence from which the jury might draw an inference that the price changes resulted from agreement. It is for the jury to weigh the evidence and determine what inferences to draw therefrom.
 
 
 25
 The proffered explanatory evidence must be differentiated from the defense of justification. A price-fixing agreement is conclusively presumed to be unreasonable. United States v. McKesson & Robbins, Inc., 1956, 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209. Therefore, any evidence of justification or reasonableness after such an agreement has been established is properly excluded in a Sherman Act case. A defendant cannot say 'I have entered into a price-fixing agreement, but the prices fixed are reasonable ones dictated by economic pressures.' The fact that the prices were reasonable is no defense. Once the defendant admits the agreement he may say no more for it is illegal per se. United States v. McKesson & Robbins, Inc., supra; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.
 
 
 26
 Here, the defendants have admitted no agreements and in order for the jury to find that any were reached they must find that fact from all the evidence, and in the face of the defendants' denials thereof. The defendants should, therefore, be entitled to set before the jury their explanation of what brought about the similar prices. The dividing line between justification and explanation may well be a fine one, but for that reason those walking on it must tread carefully.
 
 
 27
 The District Judge was correct in the original position he took in this matter when he stated:
 
 
 28
 'I think the defendants are entitled to put up their defense in this case. It is a matter which must necessarily be handled in some way in the Court's instructions.
 
 
 29
 'You (the Government) do contend, as the Court understands, this is a price fixing case, that they are entitled to show facts with respect to the economic situation among other things, but they are saying here as the Court understands- they are denying as the Court understands that they or any of them participated in any agreement or conspiracy to fix or maintain prices. They are attempting to say in their defense here that if there was a similarity or uniformity in the prices at a given time it was due to other things.
 
 
 30
 'There is some restriction there, but as to whether or not this is a price fixing case, or showing that these uniformities of prices from time to time were the result of other things, that will be for the jury to say.'
 
 
 31
 In later changing this position and excluding entirely the explanatory evidence we think reversible error was committed.
 
 
 32
 The authorities upon which appellee relies in support of the ruling do not support its position.
 
 
 33
 The principal authority is United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. In that case the Supreme Court upheld the exclusion of evidence of economic conditions. However, in so doing, the Court did not rule such evidence wholly incompetent but rather considered the particular relation of the proffered evidence to the record. The Court held that the evidence was incompetent to establish reasonableness and:
 
 
 34
 'to the extent that these offers of proof were aimed at establishing and evaluating other contributory causes for the price rise and market stability during the indictment period, they were not improperly denied. In the first place, the record is replete with evidence showing the condition of the oil industry at the time of the adoption of the code and during the code period. There was ample testimony bearing on the other casual factors which respondents contend were primarily responsible for the price rise and market stability during the indictment period. Much of the refused testimony was merely cumulative in nature. A trial court has wide discretion in a situation of that kind. The trial lasted about three and a half months. Terminal points are necessary even in a conspiracy trial involving intricate business facts and legal issues. In the second place, the offer to show the market conditions late in 1934 when hot oil was temporarily under control was not improperly denied. There was substantial evidence in the record to demonstrate the depressive market effect of hot oil. While the offer was not wholly irrelevant to the issues, it was clearly collateral.' 310 U.S. at page 230, 60 S.Ct. at page 847
 
 
 35
 The opinion sets forth the great amount of evidence relating to economic conditions put into the record during the course of a three and a half months trial. The record made during this ten day trial is devoid of any explanatory economic evidence.[1] The proffered evidence in this action was not cumulative of anything which had gone before.
 
 
 36
 The Supreme Court's reference to certain evidence as being collateral to the principal issues is pointed out by appellee as significant. The evidence which the Supreme Court deemed collateral was evidence of economic conditions prior to the indictment period. Appellee would have this Court interpret that reference as making evidence of economic conditions during the indictment period collateral also. Such an interpretation is not warranted. The Socony-Vacuum case is not sufficient authority for the limitation placed upon the defendants.
 
 
 37
 The only other authority cited by the Government in support of the order of exclusion is inapplicable herein. In Local 36 of International Fishermen, etc. v. United States, 9 Cir., 1949, 177 F.2d 320 the defendants were combined in a bargaining co-operative which the Government alleged was being utilized for a violation of the anti-trust laws. The defendants sought to show, by expert witnesses, that farmers used similar bargaining associations which were not considered to be unlawful. The Court ruled that if the defendants were engaged in an illegal venture the fact that others used similar combinations in a lawful manner was irrelevant. Other economic evidence tending to show that the general economic situation of the fishermen was a difficult one was also excluded. Such evidence is not in the class of that in question here and furnishes no guides.
 
 
 38
 In Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, certiorari denied 1950, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358, a Sherman Act conspiracy conviction was reversed for the reason that the evidence showed the defendants' price increase to have been the result of economic conditions in a standardized industry. In reaching that conclusion the Court of Appeals relied on evidence in the nature of that excluded herein. Appellee seeks to obviate the application of the Pevely Dairy case on the theory that the prosecution in that case relied on circumstantial evidence and in the instant case direct evidence of the crime was produced. As previously indicated, we do not think that the proofs in this case are conclusive as the Government contends, as the jury still had to draw inferences and reject the denials of the defendants in order to convict.
 
 
 39
 It is our opinion that prejudicial error was committed in the exclusion of defendants' explanatory economic evidence. That being so, the portion of the charge to the jury instructing them to disregard any evidence of cost factors which may have been introduced was erroneous.
 
 
 40
 The individual aspects of the proffered evidence, discussed in the briefs of the parties, will not be covered here. The District Judge excluded the evidence as a class and did not pass upon the relevancy of each item of the proffered testimony. The materiality and relevancy of each item can best be passed on in its context by the District Court on the retrial of the case. At that time evidence as to similarity of costs, operations, marketing, standardized character of the products, competitive nature of the business and other economic factors common to the defendants influencing uniform price changes in the Memphis area should be admitted.
 
 
 41
 This ruling should not, however, be construed as opening the door wide for defendants to introduce whatever economic evidence they choose. Materialityand relevancy are always in issue. The question is a narrow one- were the four Memphis bakeries operating under such conditions that uniform prices would be a natural consequence of economic conditions peculiar to their area? The evidence must not be too remote from the issue. It is within the sound discretion of the District Judge to control the conduct of the trial before him and to limit the consideration of the evidence to the purpose for which it was admissible. The court may also limit the accumulation of such evidence.
 
 
 42
 The explanatory economic evidence offered by defendants can be considered only in relation to their defense, that the price changes were not the result of any agreements. If the jury should find beyond a reasonable doubt that the defendants did enter into price-fixing agreements, as the Government contends, then the defendants are guilty and the explanatory evidence is not available to justify or excuse their conduct, for price-fixing agreements are illegal per se no matter what factors influence the parties to enter into them. If, on the other hand, the jury should find that the changes in prices resulted from these other factors, and were not the result of agreements entered into by the defendants, then the defendants are not guilty. II. Failure to Charge on Circumstantial Evidence
 
 
 43
 Notwithstanding the fact that, in our opinion, the Government's case was based largely on circumstantial evidence the District Court's denial of defendants requested charge on circumstantial evidence was not error.
 
 The requested charge included:
 
 44
 'The rule as to circumstantial evidence, stated briefly, is that the circumstances relied on must point so unerringly to the guilt of the accused as to exclude every reasonable hypothesis; that the circumstances relied upon must be proved to the satisfaction of the jury beyond a reasonable doubt; that the circumstances must be consistent with each other and inconsistent with any other reasonable hypothesis except the guilt of the accused and that they must point, as stated, so unerringly to the guilt of the accused as to exclude every other hypothesis except the hypothesis of guilty.'
 
 
 45
 In Hanson v. United States, 6 Cir., 1953, 208 F.2d 914, 916, this Court held to be error the refusal to give a similar charge. Subsequently, the Supreme Court passed on the same question, Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 137, 99 L.Ed. 150, and held:
 
 
 46
 '* * * but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.'
 
 
 47
 We have examined the District Court's general charge on reasonable doubt and find it to be clear, comprehensive and complete. Accordingly, under the dictates of the Holland decision, it was not error to deny the requested charge on circumstantial evidence.[2] III. Denial of Defendants' Requests for Production of Grand Jury Transcripts
 
 
 48
 Government counsel on several occasions at the trial utilized the transcript of the testimony of certain witnesses before the Grand Jury to refresh their recollection. Before permitting such use the Court examined the relevant parts of the transcript and permitted such use. Counsel for defendants made timely requests that they also be allowed to examine the Grand Jury transcript of those witnesses. The District Court denied the requests, and that denial is here assigned as error.
 
 
 49
 Although the stated purpose of using the witnesses' Grand Jury testimony was to refresh their recollection, at times the effect was, in practical application, very close to impeachment. In fact, the following occurred prior to the examination of 'Buck' Humbrecht concerning his Grand Jury testimony:
 
 
 50
 'Mr. Hunter (Government counsel): May it please the Court, may I approach the bench, I would like to ask a question for testing the credibility of this witness.
 
 
 51
 'The Court: All right, sir; you may examine him from the transcript the Court having examined the transcript rules that you are entitled to do that for the purpose of refreshing the witness' memory.'
 
 
 52
 An ensuing request by the defendants to examine the transcript of Mr. Humbrecht's Grand Jury testimony was denied. On other occasions, after examining the transcript and prior to granting the prosecution the use thereof, the Court noted that there appeared to be a variance between the witness' testimony on the stand his testimony before the Grand Jury.
 
 The Court, on different occasions, stated:
 
 53
 '* * * proceedings before the Grand Jury are secret and may be inquired into only in very exceptional circumstances.
 
 
 54
 '* * * it is very definitely law that counsel is not entitled to see the transcript, the testimony of this witness before the Grand Jury.
 
 
 55
 The Court would have no right to grant you that permission under the law, as the Court understands the law.'
 
 
 56
 It would appear that the Judge unduly restricted himself as he does have the right, in his discretion, under certain circumstances to permit limited examination of the transcript. Particularly this is so where the Government lifts the veil of secrecy by making use of the transcript.
 
 
 57
 The decision establishing the ground rules for the use of Grand Jury testimony by both the prosecution and defense was United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. In that decision the Supreme Court established the principle that it is within the discretion of the judge to grant the Government permission to use Grand Jury testimony to refresh the memory of a Government witness and that 'since there is no inexorable rule which under all circumstances entitles the witness and his counsel to see the prior statements made under oath and since in this case the court itself examined and thus directly controlled the use of the grand jury testimony, we cannot say that the refusal to make it available to counsel for the defense is per se reversible error.' 310 U.S. at page 234, 60 S.Ct. at page 849.
 
 
 58
 Later, in United States v. Procter & Gamble Co., 1958, 356 U.S. 677, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077, the defense was denied access to the Grand Jury transcript for use in the preparation of a civil suit even though the Government was using the transcript for that purpose. The Supreme Court noted though that 'problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like' were not reached therein and that 'those are cases of particularized need where the secrecy of the proceedings is lifted discreetly and limitedly.' 356 U.S. at page 683, 78 S.Ct. at page 987. In Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, defense counsel moved for production of a witness' Grand Jury testimony, relying on the Jencks case, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. Government counsel had not used the transcript on direct examination. The Supreme Court upheld the denial of the request, on the theory that the defendants had not attempted to invoke the District Court's discretion in the matter, but had demanded production as a matter of right and that no such right existed. The majority opinion noted that 'It does not follow, however, that grand jury minutes should never be made available to the defense. This Court has long held that there are occasions, see United States v. Procter & Gamble Co., supra, 356 U.S. at page 683, 78 S.Ct. at page 987, when the trial judge may in the exercise of his discretion order the minutes of a grand jury witness produced for use on his cross-examination at trial. Certainly 'disclosure is wholly proper where the ends of justice require it." 360 U.S. at page 400, 79 S.Ct. at page 1241. The dissenters states: 'Of course, when the Government uses grand jury minutes at trial the defense is ordinarily entitled to inspect the relevant testimony in those minutes.' 360 U.S. at page 404, 79 S.Ct. at page 1243.
 
 
 59
 Under the circumstances of the present case, however, the District Court's rulings on this point cannot be considered as error. The requests on behalf of the defendants were for the entire transcript of the witnesses' testimony before the Grand Jury. Such a demand lacks the selectivity called for under the law and is in excess of the particularized need occasioned by the Government's limited use. This practice has been condemned by the Supreme Court as 'wholesale discovery.' The defendants not having attempted to invoke the discretion of the District Judge his denial of their demands was in conformity with the rulings in the Socony-Vacuum Oil Co. and Pittsburgh Plate Glass cases. IV. Admission of Evidence of Other Acts
 
 
 60
 Under this subject heading three problems are to be considered. One is the admission generally of certain letters and reports from Continental's depot managers and other subordinate employees. The second is the portion of the Court's charge relating to the corporate defendants' responsibility for the acts of agents. The third is the admission of the previously mentioned documents and evidence of certain meetings and conversations as to defendant American individually.
 
 
 61
 Exhibits 51, 52, 57, 62, 67 and 74 were letters or reports by depot managers or route supervisors to Mr. Edd Barton, sales manager of Continental. Exhibit 53 is a letter from Mr. Barton to Mr. Humbrecht and Exhibit 54 is a letter from a depot manager to Mr. Humbrecht. Essentially, these letters were reports on the activities of competitors in the local area serviced by the depot manager or supervisor and the activities of the Continental employees in regard thereto.
 
 
 62
 Mr. Barton Testified that pursuant to instructions from himself and Mr. Humbrecht the route men were to report to the Memphis office when they discovered that goods of a competitor were being sold at a lower price than Continental's goods. These letters were dispatched by way of private mail pouches carried on the Continental trucks operating between Memphis and the various depots.
 
 
 63
 Continental objected only to the introduction of Exhibit 57, on the ground that the writer thereof had no authority to do the acts described therein. American objected to all the exhibits, on the ground that they had not been made in the regular course of business, which would qualify them for admission under Title 28 U.S.C. 1732(a). American relies on the decision in Standard Oil Co. of California v. Moore, 9 Cir., 1958, 251 F.2d 188, 212, certiorari denied 1958, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148.
 
 
 64
 The ruling in Moore was predicated on the fact that there was no showing that the firms involved had a regular procedure by which the documents were transmitted. Here, Continental had an established policy, and private mailing system, for the reporting by depot managers on competitor's activities in the field. The letters challenged were of that nature. The fact that they contained hearsay statements and personal opinions of the writer affects only their weight, and not admissibility, under 1732.
 
 
 65
 Notwithstanding the fact that these letters qualify under 1732 they are not per se admissible, for they must also be competent and relevant. Schmeller v. United States, 6 Cir., 1944, 143 F.2d 544, 550. This requires a determination of whether statements contained therein were properly considered admissions on the part of the corporate defendants. This in turn requires a determination as to whether the statements were made by the depot managers and supervisors under circumstances which require the corporate principal to accept responsibility for them. Standard Oil Co. of California v. Moore, supra, 251 F.2d at page 218.
 
 
 66
 As to those portions of the letters reporting on the activities of competitors, and the expressions of opinion in regard thereto, there can be no question that they were properly admitted, as such action was specifically authorized by the corporation, and any hearsay aspect is no bar to their admission. American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 118. However, certain of the letters told of contacts between the depot managers and supervisors with their competitors. It is urged that such action was beyond the scope of authority of the managers and in contravention of express orders to the contrary, attaching no criminal liability to the corporation, citing Holland Furnace Co. v. United States, 6 Cir., 1946, 158 F.2d 2.
 
 
 67
 Continental relies on the fact that the depot managers had no authority to determine prices and were instructed not to discuss prices with competitors, to challenge the evidence in question. As to the authority to fix prices, that is irrelevant. The evidence does not bear on fixing prices for Continental, but rather on attempts to persuade (or coerce) competitors to adjust their prices to the same level as Continental's.
 
 
 68
 The record is such that the jury could infer that the depot managers had such authority, by reason of their continuing practice of contacting competitors, which practice their superiors were well aware of and failed to object to. There is evidence in the record which would justify a determination that their superiors, in fact, adopted and ratified the acts of the depot managers. If this were so the corporation would be responsible for such acts, even if they originated in excess of the employee's authority. Clews v. Jamieson, 1901, 182 U.S. 461, 483, 21 S.Ct. 845, 45 L.Ed. 1183; Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 1950, 187 F.2d 122, 128-129, 23 A.L.R.2d 1349, certiorari denied 1951, 341 U.S. 951, 71 S.Ct. 120, 95 L.Ed. 1374.
 
 
 69
 The agents' authority to contact competitors would, as stated, be the result of the acquiescence of their superiors, 'Buck' Humbrecht and Edd Barton. Continental argues that such action on the part of Humbrecht (and necessarily Barton) would be in excess of their authority and the corporate principal should not be bound thereby.
 
 
 70
 This question of corporate responsibility for the acts of an agent is a most troublesome one. It involves issues of 'authority' and 'acts within the scope of employment.' The language of the decided cases varies in many instances, and seemingly different theories of corporate responsibility can be rationalized. However, when the decisions are viewed as an entirety, a common denominator appears.
 
 
 71
 There is an officer or agent of a corporation with broad express authority, generally holding a position of some responsibility, who performs a criminal act related to the corporate principal's business. Under such circumstances, the courts have held that so long as the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have 'authorized' the criminal act. See, New York Central & Hudson River R. Co. v. United States, 1909, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613; United States v. Armour, 3 Cir., 1948, 168 F.2d 342, 344; United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798, 801, certiorari denied 1946, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639; C.I.T. Corp. v. United States, 9 Cir., 1945, 150 F.2d 85, 90; Old Monastery Co. v. United States, 4 Cir., 1945, 147 F.2d 905, 908, certiorari denied 1945, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437; Egan v. United States, 8 Cir., 1943, 137 F.2d 369, certiorari denied 1943, 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474; Mininsohn v. United States, 3 Cir., 1939, 101 F.2d 477, 478; Zito v. United States, 7 Cir., 1933, 64 F.2d 772, 775. Although the phrases of 'apparent authority' and 'implied authority' are generally used in explaining the holdings, in truth that is more a resort to legal labelling than a basis for liability. While such fine distinctions may be determinative of liability in close questions of contract law, the true basis of liability in criminal prosecutions, where public interest is at stake, was stated in United States v. Armour, supra, when it was said:
 
 
 72
 'The Norristown manager, the Noble Street assistant manager, the various salesmen at the three branch houses, had all been entrusted with authority to act in connection with sales of appellant's products and there is evidence that while so functioning they violated the direct prohibition of the regulations respecting tie-in transactions. It appears that appellant's main office had repeatedly cautioned against such conduct, but this corporation, one extremely large in the vital food industry, cannot evade its responsibility by referring to its elaborate inter-branch correspondent and its instruction meetings. Seventeen violations of the tie-in sales prohibition in three out of a total of five branch houses in the Philadelphia area point to a condition prevailing of which it was the employer's duty to be aware. The checking and elimination of such obviously illegal practices is not shown to have been any more difficult than other details of a nation-wide industry. The employer 'does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. He must then stand or fall with those whom he selects to act for him. He is in the same plight, if they are delinquent, as if he had failed to abate a nuisance on his land. * * * It is not an instance of respondeat superior. It is the case of the non-performance of a nondelegable duty.' 168 F.2d at pages 343-344
 
 
 73
 The foregoing is a simple conclusion inherent in a complex concept. A corporation which employs an agent in a responsible position cannot say that the man was only 'authorized' to act legally and the corporation will not answer for his violations of law which inure to the corporation's benefit.
 
 
 74
 ' Buck' Humbrecht was the general manager of Continental's Memphis plant. He was responsible for the successful everyday operation of the corporate principal's business in the Memphis area. His authority was broad, commensurate with his responsibility. He generally initiated price changes, and had to approve any suggested price changes originating outside his office. If in the performance of his corporate principal's business he engaged in illegal price-fixing agreements and condoned or encouraged activities of those under his supervision in contravention of written directions from the 'Home Office' the corporation cannot deny its liability for his actions. Continental cannot divorce itself from its responsible agent to insulate itself from criminal prosecution.
 
 The jury was charged that:
 
 75
 'In order for a corporation to be responsible for the acts or statements of an agent, it is not necessary that the corporation specifically authorize the agent to commit the act or make the statement. A corporation is legally bound by the acts and statements of its agents done or made within the scope of their express or apparent authority. Express authority is that specifically given to an agent by his superior; apparent authority is the authority which outsiders would normally assume that the agent would have, judging from his position with the company and the circumstances surrounding his past conduct. When the act of the agent is within the scope of his apparent authority, the corporation is held legally responsible for it, although it may be contrary to his actual instructions and although it may be unlawful.'
 
 
 76
 This charge is an appropriate expression in simple terms of a difficult legal concept. It is particularly applicable in this case for the reason that there was before the jury an instance of the principal holding out his agent to third persons as having authority which it now asserts the agent lacked. In response to a telegram from a group of Memphis restaurant owners Continental's President stated:
 
 
 77
 'I have been out of the office for the past few days so have not had the opportunity of acknowledging your recent telegram, though I did call our Regional Manager and asked him to give me a report on the Memphis bun situation, as I am sure you recognize we do not attempt to establish prices here in the General Office, though we have been conscious for a long time that our prices on buns in Memphis have been unusually low.
 
 
 78
 'I am, however, asking Buck to give me a very complete story on this, and I am sure he will keep in close touch with you.'
 
 
 79
 It follows though, from what has previously been said, that an additional instruction should on retrial be given relating to the letters of the depot managers. The jury should be cautioned that they are not to consider the letters as evidence unless they find that the depot managers had implied authority, by reason of the knowledge of and acquiescence in their actions by their superiors, to contact competitors or that their superiors had adopted or ratified such action.
 
 
 80
 Exhibit 73 was a telegram from Leonard Heuberger of the Memphis Restaurant Association to the President of Continental in New York. It was originally offered as an exhibit to Mr. Heuberger's testimony (although withdrawn and put in evidence later) and contains nothing which Mr. Heuberger did not testify to on his direct examination. Appellants had full opportunity to cross-examine Mr. Heuberger as to the occurrence which was the subject of the telegram. Although the telegram alone might be considered hearsay there was no error in its admission into evidence in light of the fact that Mr. Heuberger testified to, and was cross-examined on, the same matter.
 
 
 81
 American contends that this body of evidence was not admissible against it. The objections and argument were predicated on the letters not qualifying under Title 28 U.S.C. 1732(a). That argument has been considered and found to be lacking in merit. The letters were clearly admissible against American under the rule that in conspiracy cases acts and declarations of a co-conspirator in furtherance of the common object are admissible against all conspirators, whether or not they have knowledge thereof. American Tobacco Co. v. United States, 6 Cir., 1956, 147 F.2d 93, 118.
 
 
 82
 American objected to the admission against it individually of three other items of evidence.
 
 
 83
 The subject matter of two of the objections were (1) evidence of a conversation between a representative of Continental and P. G. Hardin, a Mississippi baker, regarding prices in Northeast Mississippi in 1957, and (2) evidence relating to a meeting at Jackson, Mississippi in 1955 in which Continental participated.
 
 
 84
 The Government had introduced evidence of meetings in which all the alleged conspirators participated, dating back to about October, 1953. That evidence was sufficient to provide a foundation for the introduction of evidence of other acts on the part of one conspirator, in furtherance of the conspiracy, binding on all. American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 118.
 
 
 85
 American contends that it did not sell in the Mississippi areas in question, and could have had no stake in any controversies which arose there. The issue thus is whether the disputed evidence can be said to have been of acts in furtherance of the conspiracy.
 
 
 86
 Geographically, the acts were done within that area designated 'Memphis area', and come within the terms of the indictment.
 
 
 87
 As to the substance of the transactions in question, basically they involved efforts to get independent bakers to adjust their prices to the same level as those of Continental (which were the same as those of the other alleged conspirators). In our opinion, such acts were admissible as being in furtherance of the alleged conspiracy.
 
 
 88
 If one of the conspiring bakeries met with a situation in a local market wherein it was being undersold by an independent competitor a difficult problem would be presented. If the conspiring bakery did not lower its price it would stand to lose substantial business in the local market. If it did reduce its price in the local market only, it would then have a disparity with its general price structure. The probable result of that would be to bring its larger body of customers, paying the higher price, clamoring for the lower price. The net result would be general confusion and upheaval for the bakery, with resultant difficulties to the entire conspiracy in their efforts 'to maintain uniform and noncompetitive wholesale prices of bakery products.' It was in the interest of all that each not be met with price wars in local markets, and activities on the part of one to avoid such a situation were correctly considered to be in furtherance of the conspiracy.
 
 
 89
 An interesting question is presented as to the third item objected to by American. This was evidence of a meeting in Dyersburg, Tennessee about June 1950 concerning a price war going on between Hart's and Kirchoff, an independent baker, around the Kentucky-Tennessee border. The meeting was attended by representatives of Continental and Colonial, whose interest in the matter appears to have been to promote a settlement before the effects of the price war were felt in nearby areas of Tennessee in which they were selling.
 
 
 90
 The first alleged conspiratorial meeting in which American participated was in 1953. July of 1950 is the earliest date at which any activity on the part of American is shown to have taken place. About that time 'Pop' Farley, then manager of American's plant and deceased at the time of trial, was supposed to have called Tarpo Traicoff, an independent baker. The call was for the purpose of inducing Traicoff to raise his prices to the level of those being charged by Continental in his area. Farley is alleged to have told Traicoff that he personally had no interest in the matter but had been asked by Continental to use his influence with Traicoff.
 
 
 91
 The problem is this- can an act be considered in furtherance of a three party conspiracy when there is no evidence to connect one of the parties to the other two at the time the act was committed? The holdings in Frankfeld v. United States, 4 Cir., 1952, 198 F.2d 679, 689, certiorari denied 1953, 344 U.S. 922, 73 S.Ct. 389, 97 L.Ed. 710 and United States v. Buckner, 2 Cir., 1940, 108 F.2d 921, 930, certiorari denied 1940, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016, are in support of the admissibility of such evidence.
 
 
 92
 We feel that the better rule is that found in Minner v. United States, 10 Cir., 1932, 57 F.2d 506, 511. Therein the Court set forth following principles:
 
 
 93
 'To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established.
 
 
 94
 'Declarations of one conspirator to another are not competent evidence to establish the connection of a third person with the conspiracy.
 
 
 95
 'The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirators done or made in his absence.
 
 
 96
 'The acts or declarations of a conspirator prior to the formation of the conspiracy or after its termination are not admissible against his co-conspirators.
 
 
 97
 'The acts and declarations of a conspirator to be admissible against his co-conspirators must occur during the existence of the conspiracy and must be in furtherance of its objects.'
 
 
 98
 The Minner rule has been approved by the Supreme Court in Glasser v. United States, 1942, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680, wherein it was said:
 
 
 99
 'However, such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy. Minner v. United States, 10 Cir., 57 F.2d 506; and see Nudd v. Burrows, 91 U.S. 426, 23 L.Ed. 286.'
 
 
 100
 See also: May v. United States, 1949, 84 U.S.App.D.C. 233, 175 F.2d 994, 1008, certiorari denied 1949, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505; Cooper v. United States, 8 Cir., 1925, 9 F.2d 216, 226.
 
 
 101
 This Court in Wilson v. United States, 6 Cir., 1940, 109 F.2d 895 had an analogous problem before it. The question was whether evidence of criminal acts by one member of an alleged four man conspiracy was competent evidence against one of his co-conspirators when the acts had been performed five months and a year prior to the earliest date of the conspiracy as alleged in the indictment. This Court held that:
 
 
 102
 '* * * they were not competent evidence as against appellant Wilson unless and until it was shown that he had knowledge thereof or was criminally connected therewith. Appellant was entitled to instructions to this effect.' Id., at page 896.
 
 
 103
 At the time this evidence was introduced the prosecution was proceeding on a theory of a continuing conspiracy 'for many years past', without a definite beginning date. It was entirely possible that, following the introduction of this evidence, further evidence might have been introduced tying American into the conspiracy at sometime prior to June 1950. For that reason it would have been improper to caution the jury as to the application of the evidence at the time of its introduction. However, the Government having failed to connect up the evidence with American's participation in the alleged conspiracy, American was entitled to an instruction that the evidence could be considered only against Continental and Colonial and not against America.
 
 V. Evidence of Defendants' Sales
 
 104
 The admission into evidence of several items relating to the defendants' size and earnings are assigned as error. During the trial objection was made only to the introduction of the total sales figures of Continental and American for the years 1956 and 1957. Only those matters objected to at the trial will be considered here.
 
 
 105
 Appellants' claim that their total sales were not relevant to the issues here and that the evidence thereof was introduced by the Government to becloud the issues and inflame the jury. Although some comment relative thereto was made by Government counsel in his opening statement and in argument, no objection was made by appellants.
 
 
 106
 While evidence of the size and amount of sales of appellants does not establish a violation of the statute, yet these are factors to be taken into account in determining the power of the defendants to fix prices and restrain competition. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 223, 224, 60 S.Ct. 811, 84 L.Ed. 1129. Cf. American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 114. But see United States v. McKesson & Robbins, Inc., 1956, 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209. We find no error in the admission of this evidence. The evidence is, however, of limited relevancy to the principal issues of this case and its consideration should be restricted to the purposes stated.
 
 
 107
 VI. Admission of Evidence of Acts Prior to Price Freeze
 
 
 108
 From January 26, 1951 to March 5, 1953 the Director of the Office of Price Stabilization set the maximum prices permissible for bakery products. It is contended that this price freeze necessarily terminated any conspiracy entered into prior thereto, and therefore any continuing conspiracy necessarily began as of the termination of the governmental control. Appellants argue that it was error to admit evidence of any acts preceding March 5, 1953 and more particularly the evidence of the meeting at Dyersburg, Tennessee in 1950.
 
 
 109
 The sole authority relied upon is Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 370, certiorari denied 1950, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358. The reference to a similar situation in that decision is purely dicta, and does not support appellants' position to the extent claimed.
 
 
 110
 It is our opinion that the ruling in United States v. Greater Kansas City Retail Coal Merchants' Ass'n, D.C.W.D.Mo. 1949, 85 F.Supp. 503, 511 is the more logical approach to the problem. Therein it was held:
 
 
 111
 'If defendants merely sold coal at maximum prices during the enforcement period of the Act, without the existence of any agreement between them to fix, stabilize and maintain the price of coal at such maximum, the fact that each of them so retailed coal to users could be no evidence of a conspiracy. However, though defendants were by regulation promulgated under the Emergency Price Act of 1942 lawfully authorized to charge a maximum price for coal, yet if they did so by agreement to fix, stabilize and maintain such price at the allowable maximum, then we do not perceive how defendants can exclude testimony concerning that fact, if introduced solely because of the enactment of the Emergency Price Control Act of 1942. What defendants may have legally done separately under that act would, if done in concert, resulting in restraint of interstate trade and commerce, be a violation of the Sherman Act.'
 
 
 112
 Even if the price freeze were to be considered as interrupting an existing conspiracy, if the conspiracy were resumed upon the termination of the price freeze, the intervening period is more properly characterized as a period of suspension of activities rather than a termination resulting in two separate conspiracies. Under such circumstances evidence of the earlier acts would be admissible under this Court's long standing rule that the entire history of a continuing conspiracy is admissible, although prosecution for some of the period may be barred by the statute of limitations at the time of trial. American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, affirmed 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Nyquist v. United States, 6 Cir., 1924, 2 F.2d 504, certiorari denied 1925, 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810.
 
 
 113
 The observations made under this subdivision as applied to American are subject to the ruling made under subdivision IV.
 
 
 114
 VII. Refusal to Charge on Accomplice Testimony
 
 
 115
 Defendants requested the trial court to instruct the jury that the testimony of accomplices should be corroborated by other evidence before giving too much credence to such testimony. While it has been said that it is 'better practice' and 'generally desirable' to give such an instruction, its refusal is not error. Krulewitch v. United States, 1949, 336 U.S. 440, 454, 69 S.Ct. 716, 93 L.Ed. 709; Caminetti v. United States, 1917, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442; Pittsburgh Plate Glass Co. v. United States, 4 Cir., 1958, 260 F.2d 397, 402, affirmed 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323; Beavers v. United States, 6 Cir., 1925, 3 F.2d 860, 863.
 
 
 116
 It is well-settled in this Court that a conviction may be had on the uncorroborated testimony of an accomplice. Poliafico v. United States, 1956, 237 F.2d 97, 115, certiorari denied 1957, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; Robertson v. United States, 1940, 111 F.2d 1018; Nibbelink v. United States, 1934, 73 F.2d 677, 679; Ruby v. United States, 1932, 61 F.2d 617, 618, certiorari denied 1933, 288 U.S. 617, 53 S.Ct. 507, 77 L.Ed. 989.
 
 VIII. The Fines
 
 117
 On July 7, 1955 the maximum fine for a violation of the Sherman Act was increased from $5,000 to $50,000. The fines levied on defendants were all in excess of $5,000. Error is assigned in that particular.
 
 
 118
 The claim that the maximum permissible fine was $5,000 is without merit. Appellants argue that the Sherman Act punishes the simple act of conspiring, and that the conspiracy, if any, was complete in October 1953. From that premise it is urged that the maximum fine which could have been assessed was that in effect in 1953.
 
 
 119
 This theory completely disregards the fact that a continuing conspiracy was alleged and the legal presumption that a conspiracy, once established, is presumed to continue until the contrary is established. Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, 106. Furthermore, although not required to do so, Nash v. United States, 1913, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232, the prosecution put in evidence of overt acts in furtherance of the conspiracy, some of which took place subsequent to the amendment of the statute.
 
 
 120
 The defendants were charged with a conspiracy to violate the Sherman Act which continued for almost three years after the increased fine was enacted. The jury returned a verdict of guilty as charged. The levying of fines in excess of $5,000 was not error.
 
 
 121
 Appellants contend that the trial court committed plain error, which this Court may rectify under Rule 52(b) of the Federal Rules of Criminal Procedure, 18 U.S.C., in failing to submit special interrogatories to the jury, on its own motion, to determine if the jury found the conspiracy to have continued past the date the increased fine was enacted. Such a procedure of submitting interrogatories was followed in United States v. Ogull, D.C.S.D.N.Y.1957, 149 F.Supp. 272, 275, and Pittsburgh Plate Glass Co. v. United States, 4 Cir., 1958, 260 F.2d 397, 402.
 
 
 122
 Appellants were put on notice by the Court's charge to the jury that the Court was of the opinion that a maximum fine of $50,000 was permissible, should guilty verdicts be returned. They took no action to request the interrogatories which they claim it was error for the Court not to give on its own motion, and took no exception to that portion of the charge.
 
 
 123
 We find no merit whatsoever in the claim that it was plain error for the Trial Court not to adopt an unusual procedure in a criminal case for the protection of the defendants which experienced and able defense counsel did not request of the Court. Williams v. United States, 5 Cir., 1956, 238 F.2d 215, 219.
 
 
 124
 IX. Is the Verdict Supported by Substantial Evidence?
 
 
 125
 As this case will be remanded for a new trial we need only say that the evidence was sufficient, in our judgment, to justify the Court in submitting the issues to the jury. The Court was right in denying the motions for judgment of acquittal.
 
 
 126
 Judgment is reversed and cause remanded for further proceedings.
 
 
 
 [1]
 The Court instructed the jury to disregard any evidence as to cost factors that had been admitted
 
 
 [2]
 It should be noted that the first portion of the requested charge defining circumstantial evidence and instructing the jury that a conviction could be returned thereon was proper. It was only the portion quoted that was properly denied