See also D.C., 245 F.Supp. 889.

**COMMONWEALTH EDISON COMPANY et al., Plaintiffs,**

**v.**

**ALLIS-CHALMERS MANUFACTURING COMPANY et al., Defendants.**

Nos. 61 C 1278, 61 C 1689, 65 C 170, 65 C 449, 65 C 450, 65 C 451, 65 C 544, 65 C 865, 65 C 900, 65 C 920, 65 C 1000, 65 C 1001, 65 C 1003, 65 C 1005, 65 C 1007, 65 C 1013.

United States District Court
N. D. Illinois, E. D.

April 21, 1966.

Charles Bane, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff Commonwealth Edison Co.

Robert Sher, Sher & Harris, Washington, D. C., for plaintiff Porto Rico Water Resources Authority.

Harold E. Kohn, Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., for plaintiff City of Philadelphia and others.

Elroy C. Sandquist, Jr., Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., and Raymond W. Midgett, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for defendant I–T–E Circuit Breaker Co.

ROBSON, District Judge.

Plaintiffs in the above captioned actions are seeking to recover treble dam-

ages for injuries allegedly sustained as a result of price-fixing activity among the major domestic manufacturers of power switchgear assemblies including defendant I–T–E Circuit Breaker Company. Extensive pre-trial proceedings have prepared these cases for a consolidated trial which is scheduled to start on May 2, 1966.

Pre-trial proceedings conducted to date have included national and local discovery, summary judgment motions, the designation of evidence for use at trial, the filing of detailed briefs and the presentation of questions of law for ruling prior to trial. This memorandum deals with the subject matter covered by paragraph 1–C of Local Pre-Trial Order No. 13, which required the parties to submit briefs on the admissibility of " * * * evidence relating to costs, profits or losses of I–T–E or any other manufacturer of electrical equipment including power switchgear assemblies. * * * "

After carefully considering the issues and the parties' views, the Court announced the following oral ruling on February 21, 1966:

"The Court concludes that evidence of actual costs, profits and losses will be admitted at trial only if I–T–E (1) can establish that actual costs are the costs which would have been incurred absent a conspiracy, and (2) offers costs, profit and loss data for all significant market factors. I–T–E is granted ten days to file an offer of proof and supporting memorandum of its economic evidence to determine if I–T–E can satisfy this ruling.

"Plaintiffs are granted one week to file a reply memorandum. * * * " [1]

On March 30, 1966, plaintiffs moved [2] for an order precluding I–T–E "from relying on, introducing evidence of, or in any way referring to costs, profits or losses with respect to the sale and manufacture of power switchgear assemblies," and "from relying on or offering in evidence anything to support a contention, that any reduction in power switchgear assembly book or order prices in 1955 or after January 1, 1959 resulted in whole or in part from:

(1) decreases in the cost of any material;

(2) decreases in the cost of labor per unit or production;

(3) net decreases at any given time, or from time to time, in the proportion of I–T–E's productive capacity in use or the proportion of the collective productive capacity of all manufacturers of power switchgear assemblies in use (whether such net decreases in the proportion of productive capacity used resulted from increases in total productive capacity or decreases in the volume of work in progress or from any combination of such factors);

(4) increased efficiency in the production of power switchgear assemblies;

(5) changes in the predominant sizes or other predominant characteristics of power switchgear assemblies ordered; and

(6) any one or more market conditions, general economic conditions or economic determinants other than those referred to in subparagraphs (1) through (5) hereof." [3]

This memorandum (I) explains the basis for the ruling of February 21, 1966, (II)

1. Commonwealth Edison Company, et al. v. I-T-E Circuit Breaker Company, Civil Action No. 61 C 1278 and related power switchgear assembly cases. Transcript of February 21, 1966 at pp. 5–6.

2. The Court has treated this motion as filed by all plaintiffs in Civil Action Nos.

61 C 1278, 61 C 1689, 65 C 170, 65 C 449, 65 C 450, 65 C 451, 65 C 544, 65 C 865, 65 C 900, 65 C 920, 65 C 1000, 65 C 1001, 65 C 1003, 65 C 1005, 65 C 1007, 65 C 1013.

3. Motion for Preclusion Orders, filed March 30, 1966, pp. 1–2.

rules on I–T–E's offer of proof and (III) rules on plaintiffs' motion for a preclusion order.

I *The Court's Ruling of February 21, 1966.*

The ultimate dispute between the parties to these cases is whether the prices plaintiffs paid were higher than the prices which would have prevailed absent the alleged conspiracy. Defendant I–T–E Circuit Breaker Company denies that the alleged conspiracy affected prices and thus denies that plaintiffs sustained any legal injury. I–T–E asserts that evidence of its manufacturing costs will support the contention that the prices plaintiffs paid for the equipment in suit would not have differed absent the alleged conspiracy. Since the jury will not reach the question of damages unless it finds that the alleged conspiracy existed, defendant's illegal activity will be presumed for the purposes of this memorandum.

I–T–E contends evidence of actual costs is relevant:

(1) " * * * to the 'fair market value,' or what the plaintiff would have paid in the absence of a conspiracy, or 'what price would have prevailed absent the conspiracy,' or 'the price which would have prevailed in a free market,' or the hypothetical non-conspiratorial price plaintiffs would have paid measured in terms of natural competitive conditions. Indeed, no matter how the measure of damages is stated, the jury is put in the position of pricing I–T–E's equipment and it should be informed about costs and profits or losses. * * * " [4]

(2) "Whether I–T–E would have been in the power switchgear assembly business at prices plaintiffs call 'competitive' * * *." [5]

(3) "Whether periods alleged by plaintiffs to be a proper basis for determining what prices would have been in the 1946–1960 period under natural competitive conditions were in fact periods of natural competition." [6]

(4) "What is the significance of book price." [7]

Plaintiffs respond:

(1) " * * * fairness or reasonableness of price is not a sufficient answer to a charge of illegal activity in violation of Section 1 of the Sherman Act. * * * " [8]

(2) "I–T–E has stated that the price leader in the switchgear market was General Electric and that I–T–E could not within any given period of time sell switchgear above prices established by General Electric and Westinghouse, and that it was not permitted to sell below the market level because of practical economic consideration. Conceding the validity of I–T–E's statements, it is quite illogical to assume that I–T–E's costs or profits dictated or affected prices in the power switchgear assembly market. Therefore, to the extent any cost and profit data could conceivably be relevant to reconstruct price levels in non-collusive periods, the relevant costs cannot possibly be those of I–T–E alone * * *." [9]

(3) "If cost, profit and loss data are relevant * * * it must be shown that the costs sought to be introduced are, not those costs which were actually

---

4. Defendant I-T-E Circuit Breaker Company's Brief Pursuant to Paragraph 2.B. of Local Pre-Trial Order No. 13, submitted January 17, 1966, p. 9.

5. Reply Brief of Defendant I-T-E Circuit Breaker Company Pursuant to Paragraph 2.B. of Local Pre-Trial Order No. 13, dated January 25, 1966, p. 4.

6. Ibid., at p. 5.

7. Id.

8. Plaintiffs' Brief on Paragraphs 1.B. Through 1.F. of Local Pre-Trial Order No. 13, dated January 14, 1966, at p. 6.

9. Ibid., at p. 8.

incurred during the operation of the conspiracy, but those costs which would have been incurred in the absence of conspiracy. * * * "[10]

### A. Admissibility of Evidence.

 Rule 43(a), F.R.Civ.P., favors admissibility by providing for the reception of evidence under the more liberal of the applicable federal or state rule. Rule 43(a) is a "rule of admissibility, not a rule of exclusion" [11] and provides for the admission of evidence whenever a proper foundation has been established.[12] The general rule favoring admissibility of evidence is particularly applicable to antitrust cases where the liberal reception of evidence is necessary for the just determination of singularly complex disputes.

" * * * Furthermore, in antitrust cases, if full effect is to be given the anti-trust laws, it is necessary to develop fully the background of facts out of which the alleged conspiracy arose and in which it operated, and that broad discretion and great latitude toward the reception of evidence should be exercised." [13]

" * * * In antitrust cases, it is deemed essential to develop fully the background of the facts out of which the conspiracy is alleged to have arisen and in the midst of which it operated. * * * " [14]

"The cases show a marked liberality in the admission of evidence in antitrust cases for the reason, I think, that this type of litigation is mainly *sui generis* as to each case. In these cases, of course, the liberality of Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., is applied. * * * " [15]

Even with this broad approach to admissibility, the offering party must nevertheless demonstrate that the proffered evidence bears some relevant connection to the issue in dispute. Data may be logically relevant but be too insignificant, conjectural or remote for admission. Likewise, obviously probative evidence may be improper as prejudicial or against public policy. Here we are only concerned with the first question—the relevancy of defendant's and other manufacturers' actual costs, profits or losses.

 Evidence may be relevant and admissible on its face or irrelevant and inadmissible regardless of the offering party's contentions. A third type of evidence is admissible only if the offering party can meet a prior condition. In the Court's opinion the evidence in question falls into this latter category. The only costs, and resultant profits or losses, relevant in a conspiracy case are the costs which would have influenced the hypothetical competitive market price. Evidence of defendant's and other manufacturers' actual costs, profits or losses

---

10. Ibid., at pp. 9–10.

11. United States v. Featherston, 325 F.2d 539, 542 (C.A.10 1963) (a condemnation proceeding).

12. Hertz v. Graham, 23 F.R.D. 17, 24 (S.D.N.Y.1958) (tort claims arising from the collision of two thoroughbred race horses); and Atlantic Coast Line Railroad Company v. Dixon, 207 F.2d 899, 902 (C.A.5 1953) (suit under Federal Employer's Liability Act).

13. United States v. E. I. Du Pont De Nemours & Company, et al., 126 F.Supp. 27, 29 (N.D.Ill.1954) (Government suit for conspiracy to restrain and monopolize in-

terstate trade by, among other things, causing Du Pont Company to acquire a controlling stock interest in General Motors).

14. United States v. General Electric Company, et al., 82 F.Supp. 753, 903 (D.N.J. 1945) (Government suit to restrain violations of Section 4 of the Sherman Act, Section 15 of the Clayton Act and Section 74 of the Wilson Tariff Act in the incandescent electric lamp industry).

15. United States v. E. I. Du Pont De Nemours & Company, 10 F.R.D. 618 (D.Del. 1950) (Government suit for monopolization of the cellophane industry).

are relevant only if I–T–E (1) establishes that hypothetical non-conspiratorial costs, profits or loses were unaffected by the collusion and (2) offers such evidence for all significant market factors.

B. *Relevancy of Actual Costs, Profits or Losses—Legal Authorities.*

No reported opinions have considered the precise question of whether a conspirator's evidence of actual costs, profits or losses is admissible in a treble damage jury trial. Courts deliberating the admissibility of evidence on the economic experience during a conspiratorial period have generally been confronted with evidence offered by the conspiracy's victim. See, for example, Bigelow, et al. v. RKO Radio Pictures, Inc., et al., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., et al., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

■ The recorded decisions most directly on point are American Crystal Sugar Co. v. Mandeville Island Farms, Inc., et al., 195 F.2d 622 (C.A.9 1952), cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952) (antitrust treble damage trial in which defendant conspirators offered evidence of plaintiff's net profits during the conspiratorial period to minimize damages), and Ohio Valley Electric Corp. et al. v. General Electric Co., et al., 244 F.Supp. 914 (S.D.N.Y., Feinberg, J.) (electrical equipment treble damage trial in which defendants compared the direct manufacturing costs of plaintiffs' equipment and similar post-conspiracy equipment to reconstruct the competitive price for plaintiffs' machinery). The court admitted the proffered evidence in *Ohio Valley,* supra. The opinion in *American Crystal Sugar,* supra, does not

explicitly state whether the court found the evidence inadmissible, or did not consider it as the fact finder. However, it is important to note that both cases were bench trials in which the courts were properly proceeding under a more relaxed standard of admissibility.

> " * * * [T]he rules of admissibility should not be applied [in a bench trial] with the same strictness as when a jury is present. It is presumed that the trial court will not be influenced by the receipt of inadmissible evidence as will a jury. * * * " [16]

The question of relevancy was not the critical issue in either *Ohio Valley,* supra, or *American Crystal Sugar,* supra, since the court could receive the evidence and find it undeterminative. In a jury trial the court cannot control the manner in which the jury evaluates the evidence presented. It is essential that the court be certain that the proffered evidence is relevant.

The court in *Ohio Valley,* although admitting defendant's actual cost data, recognized that a conspiracy may affect the economic experience during the collusive period. This was the court's basis for rejecting the conclusion which defendants advocated:

> "At least two key assumptions upon which [the cost evidence] * * * was based must be rejected. The first is the assumption that the actual average cost of plaintiffs' units can properly be used for precise comparison purposes. It has been pointed out that collusion inhibits the usual competitive desire to lower costs in order to increase profit. * * *
>
> * * * * * *
>
> "The record here bears out the truth of this belief and indicates that the actual costs of plaintiffs' machines were higher than they would have been if price competition had been in effect

16. See, for example, New York Life Insurance Co. v. Harrington, 299 F.2d 803, 806 (C.A.9 1962) (action for double indemnity benefits under life insurance policy).

and vigorous cost reduction had been pursued. * * * " [17]

The same position was taken by the distinguished jurist, Judge Learned Hand in United States v. Aluminum Co. of America, et al., 148 F.2d 416, 427 (C.A.2 1945):

"Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone. Such people believe that competitors, versed in the craft as no consumer can be, will be quick to detect opportunities for saving and new shifts in production, and be eager to profit by them."

I–T–E relies on four cases to support its position. United States v. Eli Lilly & Co., et al.[18]; Baush Machine Tool Co. v. Aluminum Company of America [19]; F. & A. Ice Cream Co. v. Arden Farms Co., et al.[20]; and Union Carbide and Carbon Corp., et al. v. Nisley, et al.[21] None of these cases are on point. The issue in *Eli Lilly*, supra, f. 18, (Government suit for price fixing of Salk Anti-Polio Vaccine) and *Baush Machine Tool*, supra, f. 19 (treble damage action for alleged monopolization of the aluminum industry) was the discovery of defendant's cost and pricing data. In each case the discovery was permitted under the broad discovery principles followed in the federal courts. This Court has taken a similar position on numerous occasions in the electrical cases.[22] However, it is well established that the parties are granted greater latitude in discovery than in presenting evidence to a jury. Discovery requests are designed to lead to admissible evidence, but all information collected is not automatically relevant.[23]

In *F. & A. Ice Cream,* supra, f. 20, (treble damage action for alleged violation of § 3 of the Robinson-Patman Act, Title 15 U.S.C. § 13a) the court denied defendants' motion to dismiss. The basis of plaintiff's action was that defendants had predatorily cut prices to eliminate competition. The court was not concerned with the introduction of actual cost data but with the constitutionality of the statutory proviso against predatory price cutting ("the sale of goods 'at unreasonably low prices for the purpose of destroying competition or eliminating a competitor' ").[24] I–T–E has pointed to certain language in the opinion which was not an evidentiary ruling on admissibility but merely a discussion of the enforceability of the statutory standard.

The *Union Carbide* case, supra, f. 21, (treble damage action for alleged monopolization of the trade in vanadium-bearing ore) involved a suit by independent miners against integrated miner-refiner-processors who allegedly purchased the independents' ore at conspiratorially fixed prices. By allowing plaintiffs to introduce evidence of the monopsonists' profit level on the finished product, the court was applying the liberal standard for proof of injury enunciated in the *Bigelow* case, supra. This standard is not applicable to defendants whose evi-

17. Ohio Valley Electric Corp., et al. v. General Electric Co., et al., 244 F.Supp. 914, 942 (S.D.N.Y., Feinberg, J.).

18. 24 F.R.D. 285 (D.N.J.1959).

19. 63 F.2d 778 (C.A.2 1933), cert. denied, 289 U.S. 739, 53 S.Ct. 658, 77 L.Ed. 1486 (1933).

20. 98 F.Supp. 180 (S.D.Cal.1951).

21. 300 F.2d 561 (C.A.10 1962).

22. See, Atlantic City Electric Company, et al. v. General Electric Company, et al., C.A. No. 61 C 4258 and related cases, (hearing on National Pre-Trial Order No. 17), (S.D.N.Y.) transcript of August 7, 1963, pp. 6–7.

23. Independent Production Corp., et al. v. Loew's, Inc., et al., 30 F.R.D. 377, 381 (S.D.N.Y.1962).

24. Ibid., f. 20, 98 F.Supp. at p. 182.

dence must satisfy more stringent tests to be admissible.

The specific issue for decision here was considered in three electrical equipment jury trials: Philadelphia Electric Co., et al. v. General Electric Co., et al., C.A. No. 30015 (E.D.Pa., Lord, J.) (power transformers) (trial transcript pp. 5573, 5691–5694); N. W. Electric Power Coop., Inc. v. Moloney Electric Co., et al., C.A. No. 13290–3 (W.D.Mo., Becker, J.) (power transformers) (trial transcript pp. 227–228, 670–671, 2489–2495, 3765–3804, 7747–7748); and The City of San Antonio v. Westinghouse Electric Corp., et al., C.A. No. 3064 (W.D.Tex., Spears, C. J.) (steam turbine generators) (trial transcript pp. 5729–5733). Examination of the trial transcripts for these cases reveals that the courts involved held defendants' actual cost, profit or loss data relevant only if defendants could meet the two conditions set out by this Court:

(1) Establishing that actual costs are the costs which would have been incurred absent a conspiracy, and

(2) Offering cost, profit or loss evidence for all significant market factors.

The following quotes from *N. W. Electric Power Coop., Inc.,* supra,[25] indicate the rulings made by Judge Becker:

"You want me to admit the actual costs incurred in a conspiracy without any proof that they would be incurred in the absence of a conspiracy. And unless you find that case I have been asking you about every time I get a chance, I am not going to do it.

"And this is not a ruling that the evidence isn't admissible. It is a ruling that it is conditionally relevant. It is relevant only if it can be shown to be costs which would have been incurred in the absence of a conspiracy.

\*　\*　\*　\*　\*　\*

"One of the next and I think one of the biggest problems involved in it is, this will be the third point, 'How many manufacturers ( \* \* \* defendants in this case principally) must be represented in cost data.' What we are trying to find out is what the market price of power transformers would have been in 1951 and other years, '59 \* \* \* in the absence of a conspiracy. And I say that any costs which would have been incurred in the absence of a conspiracy are relevant to that determination. But subject to this qualification which. \* \* \* should apply.

\*　\*　\*　\*　\*　\*

"Let's suppose that you have four high-cost producers, one low-cost producer, and one low-cost producer not represented in the evidence. \* \* \*

"I would say the question of whether that is sufficient costs from which a market can be formed is highly doubtful.

"In other words, how can you determine what a man could buy a good automobile for if you had the going prices of everybody but General Motors, the low-cost producer in the field. I don't think a rational determination could be made."

C. *Relevancy of Actual Costs, Profits or Losses—Economic Authorities.*

The relevance of I–T–E's proffered evidence requires acceptance of its position that the manufacturers would have incurred the same costs during the conspiratorial period even absent collusion. This proposition is contrary to the view espoused by many respected economists. The insulation from competition occasioned by a collusive oligopoly may and probably does increase costs. Active price competition may cause management to emphasize efficiency programs and the development of new techniques and improved or cheaper products.[26] By pre-

---

25, Trial transcript pp. 2489–2495.

26. The American and English experiences are compared in Restrictionism and In-

venting price competition defendants may have reduced the incentive for inventive cost reductions which has historically marked free competition. As expressed by Professor Hayek:

"＊ ＊ ＊ I am, above all, convinced that, where the interests of a particular branch of trade are concerned, the majority views will always be the reactionary, stationary view and that the merit of competition is precisely that it gives the minority a chance to prevail." [27]

Unlike monopoly, collusive oligopolies may not provide the maximum benefits from economies of scale. Efficiencies of size result from increased scale in production, marketing research and financing operations and not from expanded control over supply in the market. The

demand for most products is sufficient to enable realization of the productive economies of size through a large number of plants under separate direction. Neither is it certain that the superior research allegedly supported by monopoly profits represents a net increase in research activity. [28]

"＊ ＊ ＊ In some industries firms have built up a monopoly position for themselves by being particularly active in securing economies of scale and have used their strong position as a base from which to make further technological advances. But when firms have agreed to curb their rivalry, e. g. by output or price agreements, ＊ ＊ firms may not be as keen on saving costs or increasing revenue as they would be if they had to face severe competition." [29]

centives In Great Britain, Readings In Economics 245–46 (Samuelson, Bishop, Coleman ed. 1952), reprinted from Technological Stagnation in Great Britain, Machinery and Allied Products Institute (1948). "One of the most potent and effective stimuli to the modernization of facilities, and to efficiency generally, is the presence of vigorous competition in an industry." See also Burns, The Decline of Competition 190–91 (1936); Edwards and Townsend, Business Enterprise—Its Growth & Organization 270 (1958); and the Monopolies and Restrictive Practices Commission, Report on the Supply and Export of Certain Semi-Manufacturers of Copper and Copper-based Alloys, para. 287 (1955). "Any common price arrangement is suspect on the grounds ＊ ＊ ＊ (ii) that it hinders the normal process by which low cost producers expand their business at the expense of high cost producers, and (iii) that it removes an important incentive to reduce costs."

27. Hayek, Individualism and Economic Order 30 (1948). See also, Massel, Competition and Monopoly 27 (1962). "There is a clear need for better understanding about the behavior of costs and their relationship to competition. Thus, sharp market rivalry may be the spur that compels industrial management to effectuate reductions of costs in manufacturing and distribution. Most economic theory does

not take account of many important factors affecting costs but tends to consider only the effect of a given schedule of costs on price. Such an analysis logically leads to the concept of monopoly profits. If monopoly leads to higher prices without affecting costs, the resulting margins must be greater than under competitive conditions. However, these assumptions have no empirical basis. They overlook the influence of low prices on the drive to lower costs and greater efficiency."

28. Hennipman, "Monopoly: Impediment or Stimulus to Economic Progress?", reprinted in Monopoly and Competition and their Regulation 431 (Chamberlain ed. 1954). "It must also be taken into account that the research activity of the large firms need not be a net addition to total research, as otherwise 'the opportunities for independent research laboratories selling their services in the open market would no doubt be much greater.'"

29. Edwards and Townsend, supra, footnote 26 at p. 181. For an extensive discussion of the soporific effect of monopoly see Wilcox, Temporary National Economic Committee Monograph #21, Investigation of Concentration of Economic Power 13–17 (1940). "Competition makes for material progress. It keeps the door open to new blood and new ideas. It is congenial to experimentation. It

Being unable to claim the maximum advantages of scale collusive oligopoly faces a more severe indictment than monopoly. Released from the challenge of price competition the conspirator is more likely to maintain his profit level by increasing prices than by effectuating cost reductions.[30]

"It is in their very nature that cartels restrict the fullest develop-

ments of new products and that they attempt to place rigid handicaps on output."[31]

This conspiracy allegedly entailed regular and frequent meetings, but defendants have not indicated that they will deduct even the expense of the conspiracy itself from the costs presented to this Court. The price of transportation and accommodations may be *de minimis*, but

facilitates the introduction of new products, the utilization of new materials, and the development of new techniques. It speeds up innovation and communicates to all producers the improvements made by any one of them. Competition is cumulative in its effects." * * * *

" * * * [M]onopoly inflicts no penalty on inefficiency. The monopolist may achieve economies through combination and integration; he may eliminate wastes and cut costs; but he is under no competitive compulsion to do so. Through inertia, he may cling to traditional forms of organization and accustomed techniques. His hold upon the market is assured." * * *

" * * * [M]onopoly is not conducive to economic progress. The monopolist may engage in research and invent new materials, methods, and machines, but he will be reluctant to make use of these inventions if they would compel him to scrap existing equipment or if he believes that their ultimate profitability is in doubt. He may introduce innovations and cut costs, but instead of moving goods by price reduction he is prone to spend large sums on alternative methods of promoting sales; his refusal to cut prices deprives the community of any gain. The monopolist may voluntarily improve the quality of his product and reduce its price, but no threat of competition compels him to do so." See also Clark, Studies in the Economics of Overhead Costs 145–46 (1947).

"All in all, it seems clear that in most cases monopoly, taken by itself, or monopolistic practices, or the attempt to establish a monopoly, are all unfavorable to efficiency in the positive work of production. Monopoly makes some economies possible, but the getting of it and the maintaining of it is likely to involve burdens that outweigh the benefits."; United States v. Grinnell Corp., et al., 236 F.Supp. 244 (D. of Rhode Island), decided November 27, 1964 where Judge

Wyzanski, in finding §§ 1 and 2 Sherman Act violations in the automatic alarm system industry, considered "the danger of a business becoming slothful, routinized, sleepy, or wanting in alertness, initiative, and progressiveness, as a result of the quiet life sought and usually achieved by a monopolist."; Plant, "Monopolies and Restrictive Practices," Lloyds Bank Review 7 (October 1948). "[M]onopoly means that the competitive forces which usually prevent stagnation, compel efficiency and stimulate progress are not operative, and it is doubtful whether any satisfactory alternative stimulus can be contrived."; Dimock, Business and Government 361 (1949).

30. Stocking and Watkins, Cartels or Competition? 141–42 (1948). "Cost reduction is not a common and characteristic tendency of cartel operations, because businessmen, like other people, generally prefer the line of least resistance. It is easier for firms to make profits, and to make them more secure, by boosting prices in unison than by reducing costs either together or independently." Wilson, "Restrictive Practices," reprinted in Competition, Cartels and Their Regulation 114 (Miller ed. 1962). "A firm that accounts for a high proportion of an industry's output may admittedly have swollen profits but it is often conceded that it may also offer some compensation from the economies of scale. A cartel may also restrict and exploit, but in this case there is held to be no cost reducing concentration of effort; on the contrary, a cartel may prevent such a development from taking place."

31. Berge, Cartels 28 (1944). See also, Berge at 21. "The trouble is that in many instances the misuse of research by monopolistic and cartelized groups has resulted in the restricting of production, withholding new products, and fencing in and blocking off new developments."

can the same be said of the time and effort top echelon executives diverted from their management duties to the conduct of the conspiracy? Highly paid personnel devoted extensive energy which could have been used for company business to an illegal activity.

In a non-collusive market the beneficent forces of competition generally eliminates the inefficient manufacturer. This is to be contrasted with collusive oligopoly where the most deleterious effect is continued production by high cost producers. However, when supported by competitors' agreements, prices may be fixed high enough to return a profit to producers who would not survive competition, or who might be replaced by innovating entrants into the industry.[32]

"Competition is conducive to the continuous improvement of industrial efficiency. * * * It weeds out those [producers] whose costs remain high and thus operates to concentrate production in the hands of those whose costs are low. As the former are superseded by the latter, the general level of industrial efficiency is accordingly enhanced."[33]

Conspirators may maintain excess capacity as a deterrent to entry into the industry or through miscalculation of demand. While this may be a successful technique for sustaining monopolistic control, it is also expensive. The surplus capital investment necessitates a return on the money outlay and may further increase costs.[34]

These economic theories have apparently been confirmed by experience. Empirical studies conducted in selective collusive industries indicate that conspiracy may in fact have increased costs in the steel, tobacco, nitrogen and incandescent lamp industries.[35]

32. Pribram, Cartel Problems 29 (1935). "Since the members of price associations are expected to secure prices which will at least cover costs and some profit, the minimum prices fixed, which are likely to become uniform prices, tend to be adjusted to the costs of marginal or high-cost producers." See also, Hennipman, supra, footnote 28 at 432. "[T]he influence of monopoly is preponderantly negative. It will very frequently restrict seriously, or even completely, the innovation opportunities for other firms, and in particular the possibilities of innovating entry. This tendency to obstruct more or less the free activity of others, sometimes by the bare fact of its existence, sometimes also by deliberate action in defense of its privileged position, is inherent in monopoly."

33. Temporary National Economic Committee Monograph #21, supra, footnote 29. See also, Anderson, Our Competitive System and Public Policy 291 (1958). "Cartels have come into existence in many instances to restrict production and market supply in order to achieve better balance with a weakened demand, as during a severe depression. This restrictiveness may achieve better balance between supply and demand for a time. It should be recalled, however, that the same restrictiveness limits employment in the industry, tends to maintain high-cost producers, and may, in the long run, encourage investment and production outside the cartel's jurisdiction."

34. Sales costs may also be expanded to restrict entry. See Bain, A Note on Pricing in Monopoly and Oligopoly 39, American Economic Review 463–64 (March 1949). "Departing from the realm of pure oligopoly, established collusive firms might extend selling costs beyond the point of industry profit maximization in order to discourage entry, so that the threat of entry could cause increased costs rather than reduced prices."

35. Stocking and Watkins, Cartels in Action (1946) at 123–24, 167–68 on the nitrogen industry. "For almost half a century a continually expanding demand for nitrogenous fertilizers and control schemes designed to insure monopoly prices brought a prosperity to the Chilean nitrate industry, only temporarily interrupted by market glut and severe price declines. These same influences, however, had developed serious structural weaknesses within the industry. They had offered little incentive to improve methods of production. On the contrary, they had perpetuated an inefficient technique, encouraged waste, and saddled

## II I–T–E's Offer of Proof.

The Court's ruling requiring I–T–E to file a memorandum and offer of proof of its economic data was designed to determine whether defendant's proffered evidence is admissible at trial. The document filed [36] by I–T–E pursuant to this ruling on March 9, 1966 is an amorphous, nebulous restatement of its general position. This document, viewed in the light most favorable to defendant, does not satisfy the minimum standards necessary for compliance with the Court's order. I–T–E has failed to establish the evidentiary and factual foundation for any of the evidence cited, to indicate the relevancy of any specific evidence to any specific issue in these cases, or to present its evidence in a form suitable for ruling. An offer of proof requires more than filing a list of documents and general statements of issues allegedly in dispute. I–T–E's non-compliance with the Court's ruling of February 21, 1966 is sufficient in itself to preclude its evidence of costs, profits or losses.

Even allowing for the general nature and deficiencies of I–T–E's offer of proof there are two glaring defects which preclude the proffered evidence: (1) there is no showing that actual costs, profits or losses during the alleged conspiratorial period were unaffected by the collusion, and (2) economic data for all significant market factors has not been offered. Defendant I–T–E Circuit Breaker Company contends that as a relatively small producer it had an incentive to cut costs which was not affected by the conspiracy. This leads to the assertion that defendant's actual costs, profits or losses would have been the same absent the conspiracy. However, I–T–E's argument does not meet the problem of what other conspirators costs, profits or losses would have been. Westinghouse Electric Corporation was one of I–T–E's major competitors in the power switchgear assembly business, and allegedly Moloney Electric Company, Wagner Electric Company and McGraw-Edison Company were significant market influences. [37] Yet I–T–E has not offered any evidence of those producers' actual costs, profits or losses. The Court has no basis for assuming that defendant's costs would have set the competitive market price even if such costs were unaffected by the conspiracy. In fact, I–T–E's position that it was a small, inefficient producer "which frequently found itself in a loss position and never achieved a reasonable profit on power switchgear assemblies in the period 1946–1960," [38] argues to the contrary. I–T–E has not cited one legal or economic authority for the proposition that a con-

---

the industry with obsolete and redundant productive facilities.

"But not only have prices been higher and production lower than they would have been in the absence of restrictions; costs have likewise been higher.

"The cartel raised production costs not only by fixing prices and quotas to insure survival of high-cost producers, but by preventing low-cost producers from operating on the most economical scale. The latter have been forced to distribute fixed charges over a smaller output and hence to increase fixed charges per unit of output.

"In brief, the cartel apparently made for lower output, higher costs, somewhat higher prices and lower consumption. Consumers have bought less nitrogen than they would otherwise have purchased, and they have paid more for it. The cartel has raised production costs and subsidized idle capacity." See also, Stocking, "The Steel Combination," Business Organization and Public Policy 120–125 (Levin ed. 1958) ; and Stocking and Watkins Monopoly and Free Enterprise 144–48 (1951).

36. Memorandum and Offer of Proof of Defendant I-T-E Circuit Breaker Company Concerning Costs, Profits and Losses, dated March 9, 1966.

37. Brief on Damages of Defendant I-T-E Circuit Breaker Company Pursuant to Paragraph (6) of Local Pre-Trial Order No. 15, dated January 31, 1966, at pp. 22–25.

38. Memorandum and Offer of Proof, supra, f. 36 at ii.

spirator's costs, profits or losses during the conspiratorial period are unaffected by the collusion. I–T–E has not established that evidence of manufacturers' actual costs, profits or losses is relevant to any issue in these law suits.

### III *Plaintiffs' Preclusion Motion.*

Plaintiffs' motion of March 30, 1966 requests an order precluding information solicited by (a) Interrogatory No. 9 of Plaintiffs' Set No. 1 of Local Interrogatories, and (b) Set No. 2 of Plaintiffs' Local Interrogatories. Interrogatory No. 9 sought detailed cost, profit or loss information for I–T–E's power switchgear assembly sales from January 1, 1946 through December 31, 1964. The above ruling on I–T–E's offer of proof is dispositive of this part of plaintiffs' motion. Defendant is hereby precluded from introducing such cost, profit or loss evidence at trial.

 Set No. 2 of Plaintiffs' Local Interrogatories, filed January 25, 1965, inquired whether I–T–E would contend at trial that power switchgear assembly book and order price reductions during 1955 and after January 1, 1959 resulted in whole or in part from: (1, 2) decreases in the cost of material or labor per unit of production, (3) decreases in the proportion of I–T–E's or all manufacturers' productive capacity in use, (4) increased production efficiency, (5) changes in the predominant size or characteristics of power switchgear assemblies, or (6) any other market or economic condition. I–T–E's answers to Plaintiff's Set No. 2 of Local Interrogatories were filed January 31, 1966. Plaintiffs contend that I–T–E's responses are evasive and incomplete and do not constitute good faith compliance with the Court's order. In the two months between January 31, 1966 and March 30, 1966, plaintiffs did not petition the Court pursuant to Rule 37(a), F.R.Civ.P., for an order compelling further answer to these interrogatories. For these reasons the second part of plaintiffs' preclusion motion is herewith denied without prejudice to plaintiffs' objection to the admission of such evidence at trial.

### IV *Order.*

For the foregoing reasons, it is ordered that

(1) I–T–E Circuit Breaker Company's offer of proof on the issue of costs, profits or losses is denied.

(2) Plaintiffs' request for an order precluding I–T–E from offering certain matters into evidence is granted in part and denied in part as set forth in this opinion.